# Duncan *versus* Madara.

1. A deed, besides containing courses and distances, described the land conveyed as follows: " 197 acres, being the south end of a tract surveyed by virtue of a warrant in the name of H. M., being the remaining part of said tract hitherto unsold." It appeared that the H. M. tract originally contained 447 acres, and that, before the above deed was executed, the owner had sold 250 acres from the north part thereof. The courses and distances did not correspond to the marks on the ground, and the survey would not close under them unless one of the courses was reversed and several other changes made.

   *Held*, that the above call in the deed, " being the south end of a tract, &c., remaining unsold," definitely fixed the purchase, and, in the absence of line marks found on the ground, controlled.

2. In an action of ejectment, the plaintiffs showed a paper title. Defendants then showed entry on the land under color of title, and claimed more than 21 years' open, notorious, adverse and continuous possession. Plaintiffs contended that this possession was as agents and lessees under them, and submitted a point which set out that if plaintiffs' agent made

certain agreements with A and B to clear the land in dispute, and defendants' ancestor, C, as representative of said agent, prepared the agreements and signed them in the agent's name, "per C," and these agreements were renewed from year to year by C, and A and B went into possession under them, and so remained in possession during the period covered by said agreements, that A and B became plaintiffs' tenants, and C, by so signing said agreements, recognized plaintiffs' title to the land and the right of the agent to lease the same, and that the defendants were estopped from claiming title through C during the time covered by said agreements, and that, in view of the fact that there was no evidence to show that A's and B's tenancy under said agreements had ever terminated, the jury should find for the plaintiffs.

*Held*, that the court having affirmed this point without qualification, there was nothing left to submit to the jury.

May 12, 1884.  Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Bedford county*: Of January Term, 1884, No. 116.

Ejectment, by Peter S. Duncan et. al. against James W. Madara et. al. for a certain tract of land situate in Bloomfield township, Bedford county, containing about twenty-five acres.

On the trial, before BAER, P. J., the following facts appeared: The plaintiffs claimed title under the will of Peter Shoenberger, who, on June 10, 1829, bought from John and Alexander Montgomery part of a tract of land containing 447 acres, and warranted in the name of Hugh Moore, adjoining the remainder of the same tract which Shoenberger had previously purchased from Henry Blake, who in turn had acquired it from the Montgomerys.  The plaintiffs alleged that Shoenberger, or his devisees, had been in actual possession of these lands from the time when they were first acquired by him down to 1879.

In the deed of June 10, 1829, to Shoenberger, the land conveyed was described as "one hundred and ninety-seven acres, being the south end of a tract of land surveyed by virtue of a warrant in the name of Hugh Moore, being the remaining part of said tract hitherto unsold.  Beginning at a pine corner of Ludwick Cow north 3 degrees east 90 perches to a post, in the line of said Cow.  Thence by the north part of said tract in the name of Hugh Moore north 81 degrees east 100 perches to a post original corner of Hugh Moore; thence . . . . ."

After Shoenberger's death, one James W. Duncan, who was guardian of his minor children and devisees, employed James Madara (under whom defendants claimed) as agent to take charge of all the testator's lands.  While thus acting as agent Madara thought he discovered that the deed of 1829 to Shoenberger did not, under the description therein appearing and the marks found on the land, include a triangular piece of the Hugh Moore tract containing about twenty-five acres.  This

[*Duncan v. Madara.*]

piece—which formed the subject of dispute—Madara took out a warrant for in his own name and in the name of John W. Duncan, on August 24, 1856.

In defence to the plaintiffs' paper title through Shoenberger, the defendants (Madara's heirs) set up that they had gone into possession, at least under a color of title, by virtue of the warrant of 1856; and further, that they had enjoyed open, notorious, adverse and continuous possession for more than twenty-one years.

The plaintiffs, on the other hand, contended that the twenty-five acres in dispute were included in the deed of 1829, being clearly set out in the calls in said deed; and also, that Madara's possession was simply as agent for one H. B. Wilkins, who was trustee for the Duncan heirs (*i. e.*, for the plaintiffs).

In support of the latter position, plaintiffs introduced, inter alia, the testimony of Jacob Carper, which was as follows:

" In '57 I came to adjoining tract; Cow land; knew James Madara; he was then at Bloomfield, manager for Duncan's heirs; had charge of the land; we had agreement with Madara to clear it; (proves agreement to clear 60 acres); includes this; we thought it was Duncan's land from Madara; leased it in 1858 for 3 years; I have possession yet, and always have had until now; when lease run out in 1861 I leased from Madara again; (lease shown); this is lease of Madara to me; I took it just as before, meaning it was Duncan's land; had it 5 years, beginning 1st April, 1863; it embraces land in dispute; paid rent to Madara; I paid the taxes in names of Duncan's heirs every year."

Also the following testimony of J. M. Cooper:

"First knew land in 1845; I went as manager; I had charge of Bloomfield; this piece in dispute was a part; no dispute about this then; had possession until 1851, about June; when I left, James Madara took my place; Jno. W. Duncan had then leased the Shoenberger lands."

Plaintiffs submitted the following points:

4th. " There being no evidence of marks on the ground, and it being apparent that there are mistakes in the courses and distances as written in the deed, and that on this account the survey will not close, then the calls in the deed from Montgomery to Shoenberger for '*the remaining portion of the Hugh Moore survey hitherto unsold*,' and the calls for *the north end of the Hugh Moore*, the number of acres included in the deed, viz., 197 acres added to the number of acres conveyed by Montgomery to Blake, viz., 250 acres, making up the entire amount of the Hugh Moore survey, viz., 447 acres, are strong evidence to show that Montgomery intended to and did con-

[Duncan v. Madara.]

vey the entire tract by the two deeds, and, if the jury so believe, the courses and distances in the deed must give way to the calls, and the grant to Shoenberger must be carried to the south line of the Blake, which would include the land in dispute, and their verdict must be for the plaintiffs."

For answer the court referred to the following part of the general charge:

"The deed by which we are to be governed is that from Montgomery to Shoenberger, describing the land as: Beginning at a pine corner of Ludwick Cow, thence running N. 3½° E. 90 rods to a post corner in line of the Cow survey; thence *by the north part* of said tract in name of Hugh Moore N. 81° E. 100 rods to original corner of Hugh Moore (a corner well defined and common to three contiguous surveys). It has been found that following this bearing the survey would run in the very opposite direction of the called corner and would not close, hence to locate the survey this bearing must be reversed. We say to you that in such a case, if the reversing of the bearing will close the survey, it was the duty of the surveyor to reverse it if by so doing no violence is done to the calls in the deed. For we say to you that the marks found on the ground, clearly indicating the survey, must control. By reversing the bearing and running from corner called for in the Cow line, the corner called for which is common to the three surveys, and about which there is no dispute, is struck, and the survey closes as thus run, and the land in dispute is excluded from the plaintiffs' paper title. But plaintiffs allege the starting point to so close the survey is 13 to 16 rods further north, and that the deed calls for a north line, of which the boundary of lands heretofore sold off the Hugh Moore survey, is the line, and that so running you could not follow the lines of the deed, and hence you must go to the line of the Hugh Moore survey bounding the Hannam survey, and thus include the triangle. If from the evidence you find the corner testified to by Ketterman and Fluke, Sr., existed, and was a corner in the original survey and the beginning corner thereof, and that starting there running the bearing and distance N. 3½ E. 90 rods, and thence by a reverse bearing running the distance called for and striking the corner (original corner), called for, and that the line so run excludes the triangle in dispute, then we say to you that the plaintiffs' deed does not include the land in dispute, notwithstanding the description in plaintiffs' deed that the amount conveyed is the balance remaining unsold of the Hugh Moore survey, and that it requires the north line to be abutted by the north part of said tract in name of Hugh Moore." (First assignment of error.")

[Duncan *v.* Madara.]

"6th. That if, in 1858, H. B. Wilkins, who was the trustee
for the Duncan heirs, made an agreement with Thomas John-
son, Jacob and Frederick Carper to clear this land in dispute,
as stated in the agreement of 13th March, 1858, and James
Madara, acting as agent or representative of said Wilkins,
prepared this agreement, as stated by Thomas Johnson and
Jacob Carper, and signed it 'H. B. Wilkins, per James Ma-
dara,' and the said Wilkins subsequently, as trustee, leased
this same land to Jacob Carper as the Duncan land, as testi-
fied to by Carper, by written lease, dated the 27th of March,
1862, for five years, and this lease was written by said Madara
and signed by him 'H. B. Wilkins, per James Madara,' and
that on the 9th of April, 1868, this lease was continued for a
period of two years, and this continuance was written on the
back of the lease and signed by James Madara, and that, in
pursuance of these different agreements and leases Johnson
and Carper went into possession of this land and cleared and
fenced and cultivated it, they became the tenants of Duncan's
heirs, and so continued during the period covered by these
agreements and leases, to wit: From the 13th of March, 1858,
to the 9th day of April, 1870, and that James Madara, by so
preparing and signing these agreements and leases, acknowl-
edged and recognized title in the Duncans for this land in dis-
pute, and also recognized the right of said Wilkins as trustee
to lease the same, and that the defendants are now estopped
from claiming title in James Madara for the land in dispute
during the said period of time, and that in view of the fact
that there is no evidence to show that this tenancy of Carpers
under the Duncans ever terminated or ceased to exist, the
jury should find for the plaintiffs."

Answer. Affirmed.

Verdict for defendants, and judgment thereon. Whereupon
the plaintiffs took this writ of error assigning for error the
answer to their fourth point, and the action of the court in
allowing the jury to pass upon the case after affirming their
sixth point, as above.

*Alexander King* (with whom was *John H. Jordan*), for plain-
tiffs in error.—It was admitted that some of the courses and
distances in the deed from Montgomery to Shoenberger are not
correct. They present a draft whose lines run far out of their
proper courses into an adjoining survey, and assume a shape
that it is impossible to close. Nor were marks found on the
ground to correspond to them. Under these circumstances
the calls in the deed ought to govern. These calls, as set out
in our fourth point, show clearly the intention of the parties
to convey to Shoenberger all of the Hugh Moore tract which

had not previously been conveyed to Blake. The point should have been confirmed. After the court affirmed our sixth point, what was there left for the jury? That the leases were so made and executed, and that the land was so leased, was not denied. The leases were in evidence, and the witnesses and parties who obtained them from Madara as agent for plaintiffs had testified that the leases were so made, and that the tenancy continued to exist until Madara's death, and we asked the court to rule that "the defendants were now estopped from setting up a claim to the land in dispute." Having affirmed this point broadly, it was error to submit the case to the jury without peremptory directions to render a verdict for the plaintiffs.

*Russell & Longenecker, J. M. Reynolds, John Cessna* and *J. B. Cessna,* for defendants in error.—We claimed that the courses and distances set out in the deed are to be found on the ground (except that one course is reversed, which is a very common mistake), and that they make a closed survey which excludes the tract in dispute. Our evidence the court submitted to the jury with the instruction that the marks on the ground must govern. In this there was no error, and the jury found in our favor. In determining what land is conveyed by a deed, marks and monuments upon the ground must govern. Corners established control calls for adjoiners. The courses and distances in a deed always give way to the boundaries found upon the ground, or supplied by the proof of their former existence: Lodge *v.* Barnett, 10 Wr., 477; Fletcher *v.* Clark, 48 Vt., 211. The court told the jury that if Madara was plaintiffs' agent for this land, then he could not build up an adverse possession against his principals, but if he was only general agent, then, unless the plaintiffs had paper titles or possession of the land by tenants, the defendant, Madara, would not be precluded from acquiring a title by adverse possession against the plaintiffs for the reason as to this land he would not be occupying a fiduciary relation. This was a complete explanation and answer to the theory of the sixth point of plaintiffs.

Mr. Justice GORDON delivered the opinion of the court, October 6, 1884.

With the counsel for the plaintiffs in error, we are at a loss to understand, what, after the affirmation by the court below of the plaintiffs' sixth point, there was, in this case, to leave to the jury. It is admitted that the warrant to Duncan and Madara, of the 24th of August, 1856, being located upon lands formerly appropriated by the Moore survey, was worthless, and

if James Madara, under whom the defendants claim, acting as the agent of H. B. Wilkins, the trustee of the Duncan heirs, made the several agreements and leases mentioned in said point, under which Carper and others, as tenants, entered into the possession of the premises in dispute, it is impossible to understand by what species of attornment the possession of these tenants can be made to enure to the benefit of the defendants. If Carper's testimony, in connection with the lease of the 27th of March, 1862, is to be taken for verity, and no good reason appears why it should not be so taken, then were the plaintiffs in the lawful possession of the premises, and from that possession they could not be ousted until some one exhibited a better right thereto. If, however, there be any such right superior to that of the plaintiffs, it certainly does not appear in the case now before us; the defendants have shown nothing of the kind in themselves, and the court should so have instructed the jury. But, leaving this part of the case, we are inclined to think that the plaintiffs' fourth point should have been affirmed without qualification. The land in dispute was undoubtedly covered by the Hugh Moore survey, the title to which was, previously to the 10th day of June, 1829, vested in John Montgomery, and he, by his deed of that date, conveyed all of that tract which he had not theretofore sold, to Peter Shoenberger, under whom the plaintiffs claim. The following is the description of the property as found in that deed: "Also one hundred and ninety-seven acres, being the south end of a tract surveyed by virtue of a warrant in the name of Hugh Moore, being the remaining part of said tract, hitherto unsold." Now, this Hugh Moore was a continuous tract of 447 acres, and it seems that previously to the time of the execution of the deed above mentioned, Montgomery had sold 250 acres from the north part of the tract to Henry Blake, and this, of course, left 197 acres, the southern part of the survey, unsold at the time of the conveyance to Shoenberger. Thus the call in the deed definitely fixed the northern boundary of the Shoenberger purchase, and this call, in the absence of actual line marks found upon the ground, must control: Caldwell *v.* Holler, 4 Wr., 160. But such marks are entirely wanting, unless they are to be found on the south end of the Blake lot. It is conceded that the survey cannot be closed on the north by the lines of the deed. The corner called for at the end of the line running ninety perches, north 3 deg. east from the pine, is a post, and from this we would not expect to find work upon the ground; but a still stronger indication of this fact is, that the line from this corner instead of running in such a direction as to close the survey, leaves it altogether and runs one hundred rods into the adjoining Lud-

wig Cow tract, where it is left without connection, as we may say, in the air. It is true, by reversing this course, and allowing a variation of some five or six degrees, it might be made to reach the John Moore corner, but even then the line would be too long, if the draft before us be correct, by about twenty-five perches. It will thus be seen that to close this survey by the courses and distances called for in the deed is impossible. Admitting, however, the possibility of such an attempt, it would still be unavailing unless the northern line was found upon the ground, otherwise it could not be allowed to prevail against, or over-ride the call for the northern part of the original tract.

The judgment is reversed, and a new venire awarded.