IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| HERDER SPRING HUNTING CLUB, | : | No. 5 MAP 2015 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 718 MDA 2013 dated May |
| | : | 9, 2014, reconsideration denied July 11, |
| v. | : | 2014, vacating the Judgment of the |
| | : | Centre County Court of Common Pleas, |
| | : | Civil Division, entered on July 12, 2011 |
| HARRY KELLER AND ANNA KELLER, | : | at No. 2008-3434 and remanding. |
| HIS WIFE; J. ORVIS KELLER; ELLIS O. | : | |
| KELLER; HENRY HARRY KELLER; | : | |
| WILLIAM H. KELLER; MARY EGOLF; | : | ARGUED: October 7, 2015 |
| JOHN KELLER; HARRY KELLER; ANNA | : | SUBMITTED:  January 20, 2016 |
| BULLOCK; ALLEN EGOLF; MARTIN | : | |
| EGOLF; MARY LYNN COX; ROBERT | : | |
| EGOLF; NATHAN EGOLF; ROBERT S. | : | |
| KELLER; BETTY BUNNELL; ANN K. | : | |
| BUTLER; MARGUERITE TOSE; HENRY | : | |
| PARKER KELLER; PENNY ARCHIBALD; | : | |
| HEIDI SUE HUTCHISON; REBECCA | : | |
| SMITH; ALEXANDRA NILES | : | |
| CALABRESE; CORRINE GRAHAM | : | |
| FISHERMAN; JENNIFER LAYTON | : | |
| MANRIQUE; DAVID KELLER; STEPHEN | : | |
| RICHARD KELLER; MICHAEL EGOLF, | : | |
| THEIR HEIRS, SUCCESSORS, | : | |
| EXECUTORS, ADMINISTRATORS, AND | : | |
| ASSIGNS, AS WELL AS ANY OTHER | : | |
| PERSON, PARTY OR ENTITY, | : | |
| | : | |
| Appellants | : | |

**OPINION**

**JUSTICE BAER** [1]                                      **DECIDED:  July 19, 2016**

---
[1]      This case was reassigned following submission.

This case concerns the ownership of subsurface rights to a tract of land in Centre County. The parties' claims rise or fall based upon whether a 1935 tax sale resulted in the transfer of the entire property or merely the surface rights. After extensive review of the historical law regarding tax sales of unseated land in Pennsylvania, we conclude that the tax sale related to the entire property at issue, including both the surface and subsurface estates.[2] Accordingly, we affirm the Superior Court's order vacating the grant of summary judgment in favor of the Appellants and remanding to the trial court for the grant of summary judgment to the Appellee.

I. Factual and Procedural History

The facts of this case are largely undisputed. The property at issue is the Eleanor Siddons Warrant, located in Rush Township, Centre County. The warrant was issued in 1793 as containing 460 acres, strict measure, and was assessed as 433 acres, 153 perches after taking into account roads and waterways.[3] As relevant to the

---

[2] An extensive discussion of seated and unseated land is set forth *infra* at 9. For now, it suffices to explain that "seated land" is developed or improved land where as "unseated land" is "wild" and undeveloped.

[3] As explained in the Historical Society of Pennsylvania's Land Records Guide, Pennsylvania's early land law developed from policies instituted by William Penn's sons in an attempt to encourage organized settlement and payment for the land. Generally, a person seeking to purchase land would submit an application to the Land Office. The secretary would issue a warrant, which described the land, the property adjoining the land, the purchaser, the purchase price, and the terms of sale. The issuance of the warrant triggered the surveyor general's responsibility for surveying the land, which would produce a survey map that identified important features on the land and adjoining properties and town and county boundaries, which helped to create cohesive maps of the area. Upon completion of the survey by the deputy surveyor, the surveyor general would verify the acreage, which included a six percent allowance for roads. After the survey was returned, a patent would be issued providing clear title from the state or the proprietor (such as the Penn Family) to the original purchaser of the property. Historical Society of Pennsylvania, Land Records Guide (2013) available at (continued…)

dispute in this case, Appellants' ancestors, Harry and Anna Keller, bought the Eleanor Siddons Warrant at a tax sale in 1894. In 1899, the Kellers sold the surface rights to Isaac Beck, Isaiah Beck, and James Fisher (Becks), reserving the subsurface rights to themselves through an extensive reservation that indisputably covered the natural gas at issue herein.[4]

There is no evidence in the record that the Becks complied with the Act of 1806, discussed further *infra*, which required anyone becoming a holder of unseated land to provide notice to the county commissioners of the transfer of ownership. Moreover, the record contains no evidence that the Kellers informed the commissioners of their reservation of rights. As discussed below, the Kellers were not required to report their reservation of rights under the reporting requirements of the Act of 1806. The lack of reporting, however, is relevant to this case because the county commissioners were tasked with assessing unseated property for taxation purposes based on what was reported by the owners.

---

(…continued)
https://hsp.org/collections/catalogs-research-tools/subject-guides/land-records-guide; see generally Donna Bingham Munger, Pennsylvania Land Records: A History and Guide for Research, Section IV, (1991).

[4]     In relevant part, the reservation provides:

> Excepting and reserving unto the said parties of the first part, their heirs and assigns forever all the coal, stone, fire clay, iron ore and other minerals of whatever kind, oil and natural gas lying or being, or which may now or hereafter be formed or contained in or upon the said above mentioned or described tract of land . . . .

Deed of June 20, 1899, Reproduced Record (R.R.) at 62a.

Following transfers not relevant to the issues in the case at bar, Ralph Smith acquired the surface rights to the Eleanor Siddons Warrant in 1922. Thereafter, the Centre County Commissioners acquired the property via a treasurer's sale in November 1935 as a result of unpaid taxes and the lack of a bidder offering the upset price at a public tax sale. Documenting the November 1935 sale from the Centre County Treasurer to the County Commissioners is a deed dated June 1936 using sparse language dictated by Section 9 of the Act of 1815, as set forth at 72 P.S. § 6136, describing the property as "a tract of unseated land containing 433-153 per acres situate in the Rush Twp. in the County of Centre, surveyed to Ralph Smith." Deed of June 10, 1936, R.R. at 65a.

Following the tax sale, the Commissioners held the property, in accordance with statute, until 1941 when the land was sold to Max Herr. The 1941 Deed memorialized the details of the 1935 tax sale:

> Whereas, the Treasurer of Centre County, having given due and public notice of the time and place of sale of the hereinafter mentioned tract of land, did on the 29th day of November, 1935, expose the same to public sale for nonpayment of taxes and no person bidding, therefore, a sum equal to the amount of taxes due and costs of sale, it, therefore, became the duty of the Commissioners of Centre County to buy the same, which they accordingly did.

Deed of June 3, 1941, R.R. at 64a. The 1941 Deed further recounted that the sale occurred "according to the form of the several Acts of Assembly providing the mode of selling Unseated lands for taxes" and described the property as follows:

> a certain tract of Unseated land in Rush Township, in said County of Centre, bounded and described as follows: in the Warrantee name of Eleanor Siddon[s] containing 433 acres and 153 perches; of which land the former owner or reputed owner was Ralph Smith, and the said tract of land hath remained unredeemed for the period designated by law.

Id. As will be evaluated after discussion of the relevant law, the critical question in this case is whether the 1935 and 1941 sales involved the entire Eleanor Siddons Warrant or merely the surface rights.

In 1959, Appellee Herder Spring Hunting Club (Herder Spring) purchased the property from Herr's widow. During the title search, Herder Spring's attorney became aware of the Kellers' prior subsurface reservation and suggested that language be added to the deed to reflect the reservation. The deed, describing the property again as the "Eleanor Siddons [W]arrant," generically provided, "[t]his conveyance is subject to all exceptions and reservations as are contained in the chain of title," without specifying the Keller reservation. Deed of Nov. 13, 1959, R.R. at 26a.

Since 1959, Herder Spring has entered into several oil and gas leases, which were recorded with the Centre County Recorder of Deeds. In contrast, Herder Spring observes that, since the 1899 reservation, the Keller family has never referenced ownership of the subsurface rights through any document, such as an inventory filed in connection with an estate or divorce.

In August 2008, Herder Spring filed a complaint to quiet title, presumably as a result of the discovery of Marcellus Shale on the property. Herder Spring asserted that the 1935 tax sale extinguished the Kellers' 1899 reservation of subsurface rights. The basis of the argument is that because the County Commissioners had not been alerted to the Kellers' reservation of rights, the taxes were assessed against the entire Eleanor Siddons Warrant, and the sale of the property for delinquent taxes resulted in a sale of both the surface and subsurface rights. The tax sale of the fee simple estate, according to Herder Spring, extinguished any prior reserved estates in concurrence with the longstanding policy of "title-washing."[5] In furtherance of its argument, Herder Spring

---

[5] The term "title-washing" is explained *infra* at 15.
(continued…)

observed that the deed from the Centre County Commissioners to Herr did not reference only the "surface estate" but rather the "Eleanor Siddons Warrant."[6]

Both Herder Spring and Appellants, the heirs of the Kellers (Keller Heirs) filed motions for summary judgment, which form the basis of the issues before this Court. The Keller Heirs maintained their claim that the 1935 tax sale resulted only in the transfer of the surface rights to the Eleanor Siddons Warrant, despite acknowledging that "Centre County did not separately assess the Property's oil and gas interests prior to the Tax Sale of 1935." Brief in Opposition to Plaintiff's Motion for Summary Judgment at 4. They asserted that Herder Spring's claim "fails as a matter of law because (1) only subsurface rights under operation and production have value which is assessable and taxable, and (2) only assessed property can be acquired by a tax sale purchaser." Keller's Answer to Herder Spring's Motion for Summary Judgment at 3, R.R. at 146. They emphasized that in a quiet title action, the burden of proof is on the plaintiff, here Herder Spring, to demonstrate reason to quiet title based upon the strength of their own title.

---

(…continued)

[6]      Herder Spring also asserted a claim of adverse possession of the subsurface rights based upon their leases. The trial court ultimately rejected this claim, finding that the leases did not establish the necessary twenty-one years of continuous possession. The Superior Court did not address the claim, as it ultimately found in favor of Herder Spring on the issue before this Court. Herder Spring Hunting Club v. Keller, 93 A.3d 465, 473 n.13. (Pa. Super. 2014). As no challenge has been raised in regard to the adverse possession claim to this Court, it will not be discussed further.

Additionally, the Appellants, the heirs of the Kellers, filed an answer and new matter asserting a claim of conversion, relating to the rental payments and royalty fees on the leases received by Herder Spring since 1973, and asserted a claim sounding in ejectment based upon the 1899 reservation.

The Keller Heirs further invoked the doctrine of estoppel by deed based upon the 1959 Deed to Herder Spring, which contains an acknowledgement that the "conveyance is subject to all exceptions and reservations as are contained in the chain of title." They contend that this statement reinvigorates the Keller's 1899 reservation of subsurface rights, as suggested by letters between the attorneys negotiating the 1959 transfer. They observe that this Court has held that "one claiming under a deed is bound by any recognition it contains of the title in another." Brief in Support of Defendant's Motion for Summary Judgment at 6 (quoting Elliott v. Moffett, 74 A.2d, 164, 167 (Pa. 1950)).

In turn, Herder Spring filed a motion for summary judgment. Herder Spring, *inter alia*, contended that the 1935 tax sale resulted in the conveyance of the entire Eleanor Siddons Warrant and not merely the surface rights as alleged by the Keller Heirs. Relying on the pre-1947 statues and caselaw relating to taxation of unseated land discussed *infra*, Herder Spring contended that the failure of the Kellers to notify the County Commissioners of the reservation of subsurface rights following the 1899 sale of the surface rights to the Becks, "result[ed] in the tax assessment of the fee interest [e.g. the surface and subsurface rights] to continue, and when the taxes went unpaid, it was this fee interest which was sold to [Herder Spring's] predecessor in title Max Herr." Herder Spring Summary Judgment Motion at 3, R.R. 119a. It argued that owners of unseated land were required to notify the county commissioners of their interest to allow for proper assessment and taxation and that the commissioners were not required to search deeds to determine ownership for taxation purposes. While acknowledging that a reservation of mineral rights may create an estate separate from the surface, Herder Spring contended that the 1935 tax sale involved assessment, taxation, and conveyance of the entire Eleanor Siddons Warrant because the Kellers did not report

the severance of their subsurface rights from the surface rights or pay the tax assessed on the entire Warrant.

In September 2010, the trial court denied Herder Spring's motion for summary judgment and granted the Keller Heirs' motion for summary judgment. After setting forth the history of the deeds and the proper standard for a grant of summary judgment, the trial court held that because the subsurface had not been in production for the reserved minerals it did not have any ascertainable value that could have been assessed and taxed in 1935, and therefore, could not have been sold for delinquent taxes. Accordingly, the trial court concluded that Herder Spring's predecessor only purchased the assessed surface estate at the tax sale.

The trial court further concluded that Herder Spring's "claim of ownership based on the purported failure of Harry Keller to report his reservation of subsurface rights" failed because there were was "no evidence one way or another whether the Kellers ever reported their ownership interest for assessment purposes." Tr. Ct. Op., Sept. 29, 2010, at 7. In fact, the court emphasized, there was no evidence of records of any reserved mineral interests in Centre County. Id.

While the court seemingly agreed with the Keller Heirs that Herder Spring was aware of the reservation of subsurface rights in the 1899 Deed, the court did not base its holding unequivocally on the concept of estoppel by deed. Ultimately, the trial court denied summary judgment to Herder Spring and granted it as to the Keller Heirs.

Herder Spring filed a motion for reconsideration that the trial court denied. It then appealed to the Superior Court, challenging, *inter alia*, whether the trial court erred in "failing to recognize that a prior sale of the land for non-payment of real estate taxes effectively rejoined the subsurface and surface rights." Herder Spring Hunting Club v. Keller, 93 A.3d 465, 465 (Pa. Super. 2014). A unanimous Superior Court panel

reversed the trial court and remanded for entry of summary judgment and the award of subsurface rights in favor of Herder Spring.

## II. Historical Review of Taxation of Unseated Land in Pennsylvania.

Prior to summarizing the Superior Court's decision, we first review the principles of unseated land ownership and taxation between 1894 and 1941 necessary to the Superior Court's analysis.

### A. Seated vs. Unseated Land

The critical distinction between the legal analysis in the case at bar and current property law is the concept of unseated land. Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land. [7] Seated land was property that had been developed with residential structures, had personal property upon it that could be "levied upon for the tax due", or was producing regular profit through cultivation, lumbering, or mining. Robert Grey Bushong, Pennsylvania Land Law, Vol 1, § 469(II) at 500-501 (1938). Unseated land is best understood as "wild" land but included any land that did not meet the requirements of being seated. Id. § 469(IV) at 501. The determination of whether land was seated or unseated land was entirely based upon the "eye of the assessor," who would traverse the county determining whether land was being developed and then "return" the land to the county commissioners to assess the property for taxation. Stoetzel v. Jackson et al, 105 Pa. 562, 567 (Pa. 1884).

---

[7] In 1947, the legislature repealed some of the acts underlying the concept of unseated land taxation and, instead, defined "property" for purposes of the Real Estate Tax Sale Law as including both seated and unseated land. See 72 P.S. §§ 5860.102; 5860.801.

Between the Revolution and the early 1800s, large tracts of wilderness in the interior of Pennsylvania were owned by speculators who lived on the coast in hopes that the land would increase in value as the population increased. Bushong, § 470 at 502. Many of these landowners neither developed nor paid the taxes on the land. Id. Notably, the owners of unseated lands were not always known by the county authorities such that personal notice could not be given. Long v. Phillips, 88 A. 437, 438 (Pa. 1913) (observing that for unseated land "it frequently occurs that the owner's deed is not recorded, his name is not registered, he is not known, no one is in actual possession, and there is no apparent owner or reputed owner in the neighborhood of the property."). The Commonwealth developed different sets of land tax laws to address the difficulties regrading collecting tax on unseated land. Bushong, § 472 at 503.

If the assessor determined that the land was seated, the land was taxed to the land owner, who was personally responsible for the payment of the taxes which could be collected against his or her personal property. Id., 469(II) at 501. The owner of unseated land, however, was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original warrant had been issued. See Proctor v. Sagamore Big Game Club, 166 F. Supp. 465, 475 (W.D. Pa. 1958), aff'd, 265 F.2d 196 (3d Cir. 1959). The current owner's name would be used "only for the purpose of description." F.H. Rockwell & Co. v. Warren County, et al, 77 A. 665, 665-666 (Pa. 1910). As explained by this Court in 1841,

> [T]he land itself, and not the owner of it, is debtor for the public charge; and it is therefore immaterial, at the moment of sale, what may be the state of the ownership, or how many derivative interests may have been carved out of it. With these the public has no concern. They are sold with the land, just as a remainder would be sold with the particular estate.

Strauch v. Shoemaker, 1 Watts & Serg. 166, 175 (Pa. 1841) (quotation marks omitted); see also Bannard v. New York State Natural Gas Corp., 293 A.2d 41, 49 (Pa. 1972) (holding that "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes").

As was true for seated land, this Court concluded that unseated land could be severed into surface and subsurface estates, which could be separately assessed, taxed, and, if necessary, sold at tax sale. Rockwell, 77 A. at 666. There is ample evidence in our caselaw citing to the tax books of various counties indicating the assessment and sale of mineral estates separate from the surface. See e.g. Bannard, 293 A.2d at 45; Wilson v. A. Cook Sons Co., 148 A. 63, 64 (Pa. 1929) ("where there is divided ownership of the land there ought to be a divided taxation").

The parties do not dispute that the Eleanor Siddons Warrant was unseated land at the time of the 1935 tax sale. Accordingly, we consider the taxation system on unseated property which we have noted is "separate and distinct from that enacted for the collection of taxes on other subjects." Long, 88 A. at 438.

B. Act of 1815

The arguments in this case focus substantially on the Acts of 1806 and 1815,[8] which we address in reverse chronological order as it provides better insight into the taxation of unseated property.

---

[8]    The Acts of 1806 and 1815, which amended the Act of 1804, have been repealed in large part. See e.g. 1947, July 7, P.L. 1368, No. 542, 72 P.S. § 5860.801 (repealing the Act of 1804 and 1815 as to certain taxing districts). Nevertheless, the Acts were in force during the tax sale at issue in this case. The Act of 1804, April 3, P.L. 517, 4 Sm. L. 201, was entitled "An act directing the mode of selling unseated lands for taxes." The Act of 1806, March 28, P.L. 644, 4 Sm. L. 346, was entitled "A supplement to the act (continued…)

Prior to 1815, courts required a purchaser of unseated land at a tax sale to demonstrate "an exact and literal compliance with every direction of the law" related to the sale, including even the election returns of the relevant county officers. Morton, 9 Watts at 322; see generally Bushong § 472(V) at 505. As it was nearly impossible for a purchaser to prove these details, tax sales were rarely upheld, such that "few owners of unseated lands would pay taxes." Morton, 9 Watts at 322. Additionally, the laws discouraged tax sale purchasers from improving the land because "some friendly neighbor or prowling speculator" would seek out the owner and dispossess the purchaser." Id. at 322-23.

The legislature attempted to correct this situation to encourage the development of the interior unsettled lands. See Strauch, 1 Watts & Serg at 176-77; Williston v. Colkett, 9 Pa. 38, 39 (Pa. 1848). The purpose of the Act of 1815 was to change the burden of proof "to substitute the presumption that everything was rightly done, for the proof that it was rightly done." Morton, 9 Watts at 323; see also William W. Hall, A Manual on Title Searches and Passing Titles in Pennsylvania, § 148 at 90-91 (1934). The purchaser need merely prove that "the land was unseated, and that a tax was charged by the commissioners, regularly or irregularly[, and] that the tax was unpaid and the land sold and not redeemed within two years." Morton v. Harris, 9 Watts at 324. The Court noted, however, that, while the Act presumed compliance with the requirements of a proper tax sale, an owner could rebut the presumption with direct evidence that the elements were not met. Id.

---

(…continued)
entitled 'An act enjoining certain duties on the holders of warrants not executed, and on the holders of unseated lands.'" The Act of 1815, March 13, P.L. 177, 6 Sm. L. 299, amended the Act of 1804, and was itself amended by the Act of 1847, March 9, P.L. 278.

The Act of 1815 provided specific instructions regarding the process of selling unseated land to collect unpaid taxes. It dictated that county treasurers hold a public sale on the second Monday of June 1816, and every two years thereafter for the sale of tracts of unseated land upon which the taxes had been unpaid for at least a year. Act of 1815, § 1, set forth at 72 P.S. § 5981. The act further directed the notice of the sale by publication in specified newspapers. Id., set forth at 72 P.S. §§ 6001, 6002.[9] The sales would result in "a deed or deeds, in fee simple." Id.

This Court explained that taxing and advertising land solely in the name of the warrant rather than the owner was sufficient because "[t]he assessors and commissioners cannot know of all the transfers of title which take place." Morton, 9 Watts at 325. In contrast, for seated land, notice of the pending tax sale had to be provided to the owner given that seated property was taxed in the name of the owner, unlike unseated property, subjecting the owner to personal liability for the taxes. Luther v. Pennsylvania Game Commission, 113 A.2d 314, 315 (Pa. 1955).

To protect the delinquent owner while also providing finality for the purchaser, the legislature provided a two year redemption period. Act of 1815, § 4, set forth at 72 P.S. § 6091; see generally Bushong, § 473(V) at 507. If the owner paid the taxes and costs plus twenty-five percent (later reduced to fifteen percent), then the "owner or owners shall be entitled to recover the [lands sold] by due course of law." Id. The Act of 1815, however, specified that after the two-year period:

> in no other case and on no other plea, shall an action be sustained . . . [and] no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.

---

[9] The provisions regarding the details of publication in newspaper have been revised various times and are not relevant to the issues before this Court.

Id.; Bushong, § 473(V) at 507.

If no purchaser bid a price sufficient to pay the outstanding taxes, the Act of 1815 required the county commissioners to purchase the property, as occurred in regard to the Eleanor Siddons Warrant. Act of 1815, § 5, set forth at 72 P.S. § 6131; see also Bushong, § 473(V) at 507-08. In the event of a purchase by the county commissioner, the owner had a period of five years (rather than two years) to redeem the property upon payment of all taxes and interest. Act of 1815, § 6, set forth at 72 P.S. § 6132; see also Bushong, § 473(V) at 507-09. If the property was not redeemed by the owner during the five years, the commissioners could sell the land. Act of 1815, § 7, set forth at 72 P.S. §§ 6134, 6135. Section 9 of the Act of 1815 further specified the wording of the deed from the treasurer to the commissioners, which was used in the case at bar. 72 P.S. § 6136.

While this Court noted that "some of the enactments in the law of 1815 would appear harsh and severe on the original owner," the act was considered necessary to address the evil that existed prior to it where "[t]he purchaser at a sale for taxes dare not spend money or labor on the land he bought." Morton, 9 Watts at 323. We further opined,

> A vigilant owner has nothing to fear. All he has to do is to pay his taxes, and this he is bound to do upon every principle of equality and justice. Nay, more, when this has been omitted by him, the legislature has allowed him to redeem his land within two [or five] years, terms by no means onerous.

Strauch, 1 Watts & Serg. at 176. We have repeatedly noted that any contests to the tax assessment must be brought within the statutory period and "cannot be collaterally attacked fifty years later." Bannard, 293 A.2d at 49; see also Wilson, 148 A. at 65.

C. Title-washing

An offshoot of the Act of 1815, and the Act of 1804 which it supplemented, is the concept of "title-washing." Section 5 of the Act of 1804 provided:

> [S]ales of unseated land, for taxes that are now due . . . shall be in law and equity valid and effectual, to all intents and purposes, to vest in the purchaser or purchasers of lands sold as aforesaid, all the estate and interest therein, that the real owner or owners thereof had at the time of such sale, although the land may not have been taxed or sold in the name of the real owner."

This Court explained that "a tax sale extinguishes all previous titles," Reinboth v. The Zerb Run Improvement Co., 29 Pa. 139, 145 (Pa. 1858), and excludes "all other claimants to the land of a prior date." Caul v. Spring, 2 Watts 390, 396 (Pa. 1834).

In Powell v. Lantzy, 34 A. 450 (Pa. 1896), this Court explained the rationale underlying title-washing, although it did not use the term. The Court addressed a tract of unseated land which had been assessed and taxed as an undivided piece of property in 1882 and 1883. Despite the pending delinquent taxes, the owner of the property sold the surface rights and reserved the coal and mineral rights in 1883. In 1884, a tax sale purported to encompass the entire property based upon the 1882 and 1883 pre-division assessment and taxation. In the case, the individual who had purchased the surface rights from the owner in 1883 then purchased the entire property via the 1884 tax sale, thus gaining the subsurface rights.

The Court in Powell questioned whether there was an equitable reason for forbidding the surface owner from purchasing the entire property at tax sale. This Court recognized that, as to unseated land where the tax was imposed on the land and therefore not the landowner's personal responsibility, nothing prevented "the holder of a

defective title from purchasing a better one at a tax sale." Id. at 548 (quoting Coxe v. Gibson, 27 Pa. 160 (Pa. 1856)).

As relevant to the case at bar, the court explained the duty, or lack thereof, of landowners to pay taxes: "The whole was subject to a claim for taxes which existed before they acquired title, and which neither [the surface nor the subsurface owner] was under any obligation to the state to pay. If either [the surface or subsurface owner] had paid it, he could not have recovered of the other his proportionate share." Id. at 549. Moreover, it opined that there was no way to apportion the tax. "Any moral obligation to agree and jointly pay the tax, each contributing his just share, rested equally upon the owners of the different parts; but there was no legal duty on either to do this. It was their separate, not their joint, interests which were in peril." Id. at 550. The Court thus affirmed the purchase of the entire tract by means of a tax sale based upon the taxes assessed and unpaid on the property prior to the division. See also Hutchinson v. Kline, 49 A. 312 (Pa. 1901).

In Proctor v. Sagamore Big Game Club, the federal courts addressed a tax sale of unseated land in the late 1800s for purposes of land transactions in the 1950s, which mirrors the timeframe of the case at bar. Proctor, 166 F. Supp. at 470, aff'd, 265 F.2d at 200-01. In 1893, Thomas Proctor (Proctor) purchased an unseated property from the then-owner at a time when the prior year's taxes had not been paid. After purchasing the property, Proctor apparently did not pay the delinquent 1892 taxes. Accordingly, the property was subjected to a tax sale in 1894 and was purchased in fee simple by G.W. Childs (Childs). Months later, Proctor, despite the tax sale, purported to sell the property to Elk Tanning Company but reserve the mineral interests to himself. Childs,

who was also president of Elk Tanning Company, later assigned his interest in the mineral rights from the tax sale to the company. [10] Proctor, 265 F.2d at 200.

In the 1950s, Proctor's heir attempted to invalidate the tax sale to Childs by claiming that the deed from the tax sale had not been property acknowledged or that there were fraudulent aspects of Childs' dealings with his company. After rejecting the claim that the deed was not properly acknowledged, the court observed that the tax sale had divested the prior owner of the ability to sell the property and reserve any mineral rights as all the owner's rights had been extinguished via the tax sale. Proctor, 166 F. Supp. at 470, aff'd, 265 F.2d at 200-01. Moreover, the court held, that "[w]hen there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals." Proctor, 166 F. Supp. at 475. As in the case at bar, it appears that the property had been divided into separate mineral and surfaces estates, but had nonetheless been sold as a united whole property for the failure to pay taxes on the property, which was assessed as a unit. See also Powell, 34 A. at 451.

Accordingly, courts interpreting Pennsylvania law have a long history of accepting the concept of a tax sale reuniting severed estates of unseated property and perfecting previously defective titles.

D. Reporting Duties of Owners vs. County Commissioners under the Act of 1806

---

[10] As an interesting historical note, the parties involved in this transaction were also involved in other similar transactions covering a substantial portion of several counties in a purported attempt to consolidate bark lands into the United States Leather Company, arguably with the land owners reserving mineral rights. Proctor, 265 F.2d at 201-02. Proctor and Childs were both tannery owners. Id.

Factually, the issues in this case turn on whether the taxes assessed and not paid in 1935 were assessed on the Eleanor Siddons Warrant as a whole or merely upon the surface estate. In addressing this issue, many of the arguments in this case have focused on whether the Kellers had a duty to report the 1899 subdivision of the estate into surface and mineral estates to the Centre County Commissioners, which would have triggered a separate assessment and taxation of the Keller's mineral estate (or no taxation if it had no value). This question requires our review of the Act of 1806, as well as its predecessor, the Act of 1804.

In regard to unseated property, the Act of 1804 initially required the deputy surveyors to report to the commissioners regarding all the lands surveyed in the county with a list including the acreage and the surnames on the original warrant, *e.g.* the Eleanor Siddons Warrant. Act of 1804, § 1. The commissioners, in turn, were required to keep a book listing each tract with the acreage and the name of the original owner. Id.

The Legislature enacted the Act of 1806 to provide that "it shall be the duty of every holder of unseated lands" to provide the county commissioners with a signed statement describing the tract of land and "the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title." Act of 1806 Section 1. To address future transfers, the Act provided:

> [I]t shall be the duty of every person hereafter becoming a holder of unseated land, by gift, grant, or other conveyance to furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor, with in one year, from and after such conveyance.

Id., set forth in substantial part at 72 P.S. § 5020-409. The penalty for failing to provide this information was "four times the amount of tax to which such tract or tracts of land

would have been otherwise liable." Id. Notably, the penalty was purely for failure to report and did not address the penalty for failure to pay the tax, which is at issue in the case at bar.

The Acts did not impose any duty on the county commissioners to obtain information regarding the unseated land or to search through deed books to discover whether lands had changed hands. See Stoetzel v. Jackson, 105 Pa. 562, 567 (Pa. 1884). Instead, the obligation was initially on the surveyors to return the surveys and then on the original and subsequent owners to inform the commissioners of the land owned to allow the commissioners to impose an appropriate tax. In Heft v. Gephart, 65 Pa. 510, 516 (Pa. 1870), this Court opined that the tax system treated unseated lands "entirely in reference to the original warrants when not otherwise directed by the owners." The courts of Pennsylvania have considered the consequences of tax sales of unseated lands in connection with an owner's duty to report under the Acts of 1806 and 1815. We will review several of these cases.

In a case specifically considering the ability to tax a subsurface estate, this Court emphasized the distinction between the right of owners to sever and the taxing authorities assessment of taxes: "The authority to tax and the manner of its exercise has nothing to do with the right of the owner either to hold his tract of land entire or to sever it by the grant of different estates therein." Rockwell, 77 A. at 666. In reaffirming that unseated, as well as seated, landholders could sever their subsurface estates, we recognized that the method for assessing taxes on unseated estates differed from that of seated estates based upon "the difficulties of ascertaining the owners, and other like considerations." Id.

In Williston, this Court faulted an owner's failure to report to the County Commissioners an error in the tax assessment of his property, which resulted in his

paying taxes for several years upon only a third of the acreage of the warrant he owned. After the landowner failed to pay taxes and a tax sale occurred, this Court concluded that the tax sale covered the acres identified in the original warrant despite the significantly smaller acreage listed on the assessment, because the assessment was based on land as "identified by the number of the warrant, the name of the warrantee and the name of the owner from whom [the current landowner] had purchased." Williston, 9 Pa. at 39. The number of acres in the assessment, which the owner failed to correct, was merely a descriptive term. Accordingly, the Court concluded that the details in the warrant controlled, absent correction by the owner.

In McCoy v. Michew, 7 Watts & Serg. 386, 1844 WL 5025 (Pa. 1844), this Court recognized that the commissioners were not responsible for determining land ownership for purpose of taxation and instead that the burden was on the landowners pursuant to the legislative enactments culminating in the Act of 1815. In that case, this Court addressed the contested ownership of a tract of land that apparently was covered by different warrants. The Court faulted the owner who had failed to report or pay tax on the land for thirty years, and then sought to establish ownership when the land had appreciated in value, long after the statutory redemption period. The Court noted, "If there be hardship, it is one which can easily be avoided by performing the duty which the law imposes upon [the owner], to return the land and pay his taxes." Id. at 391, 1844 WL 5025, at *5.

In Hutchinson v. Kline, this Court affirmed *per curiam* a decision of the Elk County Court of Common Pleas. While this Court did not provide binding analysis, the trial court's opinion gives insight into the judiciary's view of tax law at that time in a case

analogous to the case at bar. [11]  In <u>Hutchinson</u>, as in this case, unseated land had been divided into a surface and subsurface estate by deed, but there was no indication that the surface and subsurface had been assessed separately, prior to a tax sale of the lands for delinquent taxes on the entire property.  The trial court opined that it was the duty of the holder of unseated lands under the Act of 1806 to give notice of the severance to the commissioners or the assessors.  <u>Hutchinson</u>, 49 A. 312 (citing <u>Williston</u>, 9 Pa. 38).  The court observed that assessors would treat unseated lands "entirely in reference to the original warrants, when not otherwise directed by the owners."  <u>Id.</u>  The court additionally noted that that it was not "the business of the assessor to inquire what is the nature of the owner's title."  <u>Id.</u> (citing <u>Stoetzel</u>, 105 Pa. 567).  After noting that the subsurface owners had neither paid tax nor reported their ownership interest as set forth in the Act of 1806, the court opined, "[t]he record of the deed creating a separate estate in the minerals would not be notice to the assessor or the commissioners, as they were not bound to search or examine the records."  <u>Id.</u>

Accordingly, under caselaw applying the Act of 1806, the failure to report a severance of unseated land could result not only in a four-fold statutory penalty, but also had the practical effect of having the property assessed and taxed as a whole, given that the assessors were not required to determine the sometimes elusive current ownership.


III. Superior Court Decision

As discussed in the procedural history section of this opinion, Herder Spring appealed to the Superior Court challenging the trial court's order denying its summary

---

[11]     At the heart of the case in <u>Hutchinson</u> was a question regarding whether the land was seated or unseated that is not relevant in the case now before this Court.

judgment motion and granting summary judgment in favor of the Keller Heirs. As relevant to the issues before this Court, Herder Spring contended that the trial court erred in concluding that the 1935 tax sale to the County Commissioners and the 1941 Deed to Herr involved only the surface estate, such that the mineral rights remained with the Keller Heirs. Instead, Herder Spring asserted that the transfers involved the entire Eleanor Siddons Warrant based upon the absence of notice to the County Commissioners of the Kellers' 1899 severance of the surface and subsurface estates. Herder Spring appealed relying heavily upon the law discussed above.

The Keller Heirs responded that the Kellers were not required to report the severance under the Act of 1806, and that even if they were required to report the severance, the penalty for failure to report was the four-fold tax penalty rather than the loss of their property at a tax sale. Alternatively, the Kellers argued that Herder Spring was estopped from asserting their claim based upon the acknowledgement in their 1959 Deed that the deed was subject to any reservations in the chain of title.

After discussing the extensive deed history, the Superior Court concluded that because the 1899 severance had never been reported to the County Commissioners, the Eleanor Siddons Warrant was assessed and taxed as a whole and thus was sold in its entirety in the 1935 tax sale. Herder Spring, 93 A.3d at 472. The court observed "that the tax deeds do not reflect that any interest in the land less than a fee simple was ever assessed," such that the court could presume that the sale to Herder Spring's predecessor encompassed the full Eleanor Siddons Warrant including both the surface and subsurface rights. Id. at 473.

In reaching its conclusion, the Superior Court opined that it was the Kellers "affirmative duty" under the Act of 1806 to inform the County Commissioners of the severance to allow the separate assessment of the surface and subsurface estates. Id.

at 473. The court opined that, absent proof to the contrary, it could presume that the severance was never reported which resulted in the continued assessment, taxation, and sale of the entire Eleanor Siddons Warrant for the failure to pay taxes. The court recognized that the commissioners were not obligated to determine the ownership of unseated land. Id. at 470-72.

The Superior Court rejected the Keller's challenge to the sale of the entire estate. The court noted that the Act of 1815 required the presumption that the tax sale was proper absent a challenge within the initial two-year redemption period. Id. at 473. Therefore, when the initial redemption period passed without a challenge to the sale or the deed, no party could challenge the process of the tax sale, which the Superior Court had concluded related to the entire Eleanor Siddons Warrant.

The court additionally rejected the Keller Heirs' claim that the Kellers' mineral estate could not have been taxed or sold for delinquent taxes because it had no value given that it was non-producing and that the value of the minerals was unknown. The Superior Court opined that the valuation argument should have been asserted during the redemption period and could not be raised now. Absent a contemporaneous assessment of the value of a mineral estate, the court additionally recognized this Court's caselaw noting the confusion that would be caused by "[a]ttempts to prove that accessors [sic] did or did not know of the presence of oil or gas when they assessed 'minerals' at some point in the past." Id. at 473 n.11 (quoting Bannard, 293 A.2d at 49). Confusion, the court noted, would result from not knowing what had been sold based on whether the specific mineral had been known to exist at a specific time, which was an unworkable system.

The Superior Court additionally dismissed an *amicus curiae*'s argument that the statutory penalty for an owner not reporting ownership to the commissioners was a

penalty of four-fold the tax, rather than forfeiture at a tax sale. Id. at 471 n.10. The court also rejected any reliance on the 1959 Deed's reference to "being subject to all exceptions and reservations as are contained in the chain of title," concluding that the chain of title in 1959 did not contain any "active exceptions or reservations." Id. at 473.

In concluding, the court suggested that the "resolution of this matter is at odds with modern legal concepts." Id. at 473. Nonetheless, the Court opined that it was not "proper to reach back, more than three score years, to apply a modern sensibility and thereby undo that which was legally done." Id.

### IV. Analysis

After the Superior Court denied their petition for reargument *en banc* or reconsideration, the Keller Heirs filed a petition for allowance of appeal which this Court granted.[12] Herder Spring Hunting Club v. Keller, 108 A.3d 1279 (Pa. 2015).

Initially, we observe that this case involves competing summary judgment motions. Accordingly, while our scope of review of the trial court's determination is plenary, we will only reverse if the court committed an error of law or abused its discretion. *Atcovitz v. Gulph Mills Tennis Club,* 812 A.2d 1218, 1221 - 22 (Pa. 2002). "Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Id. (citing, *inter alia*, Pa. R. Civ. P. 1035.2). Moreover, courts review the facts at summary judgment stage in a light most favorable

---

[12] The Keller Heirs are supported in their arguments addressed below by their *amicus curiae* the Trustees of the Thomas E. Proctor Heirs, et al. Our analysis is further informed by the arguments supplied by Herder Spring and its *amici curiae* the Pennsylvania Department of Conservation and Natural Resources, Range Resources, SWN Production Co., LLC, and Seneca Resources Corp.

to the nonmoving party. <u>Id.</u> We additionally recognize that Herder Spring, as the plaintiff bringing a quiet title action, has the burden of proof and must recover on the strength of its own title. <u>Albert v. Lehigh Coal & Nav. Co.</u>, 246 A.2d 840, 843 (Pa. 1968).

### A. Extent and Legal Consequences of 1935 Tax Sale

The Keller Heirs' first issue addresses the overarching question in this case: whether the 1935 tax sale to the County Commissioner resulted in the sale of only the surface estate or the entire Eleanor Siddons Warrant. They essentially claim that the Kellers' proper filing of their 1899 deed conveying the surface estate, but reserving the subsurface estate, placed Centre County on notice of the severance of the property, such that the 1935 tax sale solely conveyed the surface property. They emphasize that the 1936 Deed referenced the land "surveyed to Ralph Smith," the surface owner of the property at the time. This first issue contains several sub-issues, addressed *seriatim*.

Initially, the Keller Heirs fault the Superior Court for imposing an affirmative duty on the Kellers to report the severance under the Act of 1806. We conclude that the Keller Heirs are correct that the relevant portion of the Act of 1806 imposed a reporting duty only on a party "becoming a holder of unseated land," and that, given their prior ownership of the entire Warrant, the Kellers did not "become" a holder of unseated land by selling the surface estate and reserving the mineral estate. [13]

Nevertheless, based upon the case law discussed at length above, we agree with the Superior Court's conclusion that if neither the Kellers nor the purchaser of the

---

[13] As a separate issue, the Keller Heirs assert that the Superior Court exceeded its fact-finding authority in determining that the Kellers did provide notice of the severance for purposes of compliance with the Act of 1806. As we conclude that compliance with this aspect of the Act of 1806 is not definitive, we will not discuss this issue.

surface rights in 1899 reported the transfer, then the Centre County Commissioners would have assessed and taxed the Eleanor Siddons Warrant in its entirely. We unequivocally stated in Heft that the tax system relating to unseated land, including the Acts of 1806 and 1815, treated unseated land "entirely in reference to the original warrants when not otherwise directed by the owners. Heft, 65 Pa. at 516; see also Hutchinson, 49 A. 312; Williston, 9 Pa. at 39; McCoy, 7 Watts & Serg. at 390. As ownership of unseated land was not easily ascertainable, the County Commissioners were not tasked with searching deed records to determine the present ownership of unseated land. See Rockwell, 77 A. at 666; Stoetzel, 105 Pa. at 567.

Next, we reject the Keller Heirs' claim that the reference to the "land surveyed to Ralph Smith" in the 1936 Deed from the Treasurer to the County Commissioners indicated that the deed was limited to the surface estate. Instead, we recognize that unseated land was assessed and taxed in the name of the Warrant, and any reference to the presumed-current owner, such as Ralph Smith, was merely used for descriptive purposes. See Bannard, 293 A.2d at 49 (holding that "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes"); Rockwell, 77 A. at 666; Strauch, 1 Watts & Serg. at 175.

We additionally find unpersuasive the Keller Heirs' argument that the Act of 1806's four-fold tax penalty would apply to this case. The Keller Heirs properly recognize that the penalty for failing to report under the Act of 1806 was four times the relevant tax. The 1935 tax sale at the heart of this case, however, was not triggered by

the failure to report ownership but instead by the failure of the owner or owners of the taxed property to pay the assessed tax.[14]

The Keller Heirs next contend that the 1935 tax sale should not be deemed to encompass the reserved mineral rights because those rights did not have taxable value in 1935.[15] The Keller Heirs rely upon language in Rockwell acknowledging that a subsurface estate can only be subject to tax if it is demonstrated that mineral or other rights have actual value either through current production or an evaluation of neighboring properties. Rockwell, 77 A. at 665. They claim that the reserved rights in this case had no value as of the tax sale in 1935. The Keller Heirs, however, fail to recognize that the potential assessable value of the minerals is irrelevant to whether the 1935 assessment addressed the Warrant as a whole or merely the surface estate. Indeed, their theory could lead to a windfall for fee simple owners, who years after the

---

[14] In support, the Keller Heirs rely upon this Court's decision in City of Philadelphia v. Miller, 49 Pa. 440, 450-52, (Pa. 1865), where the Court used language emphasizing that the seizure of property should not be substituted for the four-fold penalty to report. That case, however, involved an unusual situation where the tax assessment listed a warrantee name completely unrelated to the name connected to the unseated land at issue due to a transcription error.

[15] The Keller Heirs suggest that the gas rights, included in the reservation of subsurface rights, should be deemed conclusively to be non-taxable given our recent holding that oil and gas should not be subject to *ad valorem* taxes because those substances are not "land." Independent Oil and Gas Assoc. of Pa. v. Board of Assessment Appeals of Fayette Co., 814 A.2d 180 (Pa. 2002) (IOGA). We reject this argument as we have held that IOGA only applies prospectively. Oz Gas, Ltd. v. Warren Area School District, 938 A.2d 274 (Pa. 2007). In applying IOGA prospectively, this Court specifically emphasized the need to protect taxing authorities' reliance on prior oil and gas taxes. Id. at 284. We also noted that the trial court in that case additionally observed that "[r]etroactive application of IOGA would, in effect, invalidate each of those tax sales, perhaps leading prior owners to seek return of the properties lost to those tax sales." Id. at 279. The trial court and this Court both concluded that such consequences weighed in favor of applying IOGA prospectively only.

tax sale of the entire property could claim that the prior tax sale should be deemed to have exempted specific mineral rights that at the time of the sale had no value, but today are coveted, with Marcellus Shale being an obvious example. Such a theory would result in chaos whereby courts today would be required to determine whether certain minerals or other subsurface rights would have had taxable value in the late 1800s. See Bannard, 293 A.2d at 49.

Moreover, as set forth above, if the Kellers disputed the County Commissioners' failure to assess their subsurface estate separately from the surface estate, they should have contested the assessment and tax sale within the initial two-year redemption period. After the expiration of that redemption period, a challenge to the propriety of the tax sale would not be heard under Section 4 of the Act of 1815: "no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." 72 P.S. § 6091; see also Bannard, 293 A.2d at 49; Strauch, 1 Watts v. Serg at 176; Bushong, § 473(V) at 507-10.

Finally, the Keller Heirs attempt to distinguish the caselaw relating to title-washing by emphasizing that the cited cases, such as Powell v. Lantzy, address situations where the severance occurred after the imposition of taxes, whereas the severance of the Eleanor Siddons Warrant occurred in 1899, years prior to the assessment and taxation that lead to the 1935 tax sale. They also minimize the significance of Hutchinson, which involved a pre-taxation severance, as this Court merely affirmed per curiam. Instead, the Keller Heirs rely upon this Court's decision in Tide-Water Pipe Co. v. Bell, 124 A. 351 (Pa. 1924), to support their claim that "title-washing" does not apply to duly recorded prior estates or interests because the tax sale

under Section 5 of the Act of 1804 only conveys the interest "of the real owner or owners."

In Tide-Water Pipe Co., this Court addressed the effect of a tax sale on a right-of-way granted nearly forty years earlier by the prior owner to Tide-Water Pipe for the construction of above-ground petroleum-carrying pipes, which traversed the entire Commonwealth. The Court reiterated the well-established principle that a right of way which is open, notorious, permanent, and continuous is not affected by either a private or public sale of the property over which it passes. Id. at 353. The Court found no reason why this long established rule would not also apply to a treasurer's sale of unseated land for delinquent taxes. The Court held that the purchaser at a tax sale takes the land subject to an easement, servitude, or interest in the nature of an easement. Id. The Court also opined that an easement or right of way was distinct from the fee, and thus did not pass with the tax sale.

We conclude that this Court's holding in Tide-Water Pipe, relating to easements and rights of way, is not controlling in regard to a subsurface estate if the estate has been assessed and taxed as a whole. Unlike the open and notorious above-ground pipes which made all aware of the right-of-way, a severance of a subsurface estate could not be viewed by the assessor. Thus, if the warrant had been assessed as a whole, the tax sale would have divested "all the estate and interest therein, that the real owner or owners had at the time of such sale." Act of 1804, § 5. In contrast, the easement or right of way in Tide-Water Pipe was not an "estate [or] interest" of the property owner and, thus, was not affected by the tax sale under the Act of 1804. Tide-Water Pipe, 124 A. at 355.

Additionally, in light of our caselaw recognizing the difficulty assessors had in ascertaining the then-current ownership of unseated land and providing for the

assessment to be based on the entire warrant in the absence of direction from the owners, we reject the Keller Heirs distinction based on the timing of the assessment versus the severance. See Hept, 65 Pa. at 516. As discussed, tax on unseated land was the liability of the land rather than the owners. Therefore, if the property was assessed as a whole property and none of the owners paid the tax, then the property would be sold as a whole to satisfy that tax. As cogently set forth in Powell v. Lantzy, "[a]ny moral obligation to agree and jointly pay the tax, each contributing his just share, rested equally upon the owners of the different parts; but there was no legal duty on either to do this. It was their separate, not their joint, interests which were in peril." Id. at 550; see also Proctor, 166 F.Supp. at 475 ("[w]hen there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals"); Hutchinson, 49 A. 312. We find no distinction based upon the timing of the severance.

After rejecting the Keller Heirs' various arguments regarding the effect of the 1935 tax sale, we next consider whether the documents in the record demonstrate the 1935 tax sale was imposed on the Eleanor Siddons Warrant as a whole. We reiterate that the caselaw counsels that unseated land should be assessed according to the original warrant, absent direction from the owners, and that a tax sale conveys the property covered by the assessment. See New York State Natural Gas Corp. v. Swan-Finch Gas Development Corp., 278 F.2d 577, 579 (3d Cir. 1960) (recognizing "the well established rule that a tax deed conveys only such interest as was actually assessed to the defaulting taxpayer," citing Brundred v. Egbert, 30 A. 503, 505 (Pa. 1894)). Moreover, Section 5 of the Act of 1804 provided that a tax sale of unseated land conveys "all the estate and interest" "that the real owner or owners thereof had at the

time of such sale," such that the tax on the entire estate would convey all rights held by the owners of the assessed property.

In this case, the documents relating to the 1935 tax sale provide no indication that the assessment and taxation occurred on anything other than the entire Eleanor Siddons Warrant, as they provide no reference to the surface estate or a reserved subsurface estate. Therefore, we conclude that the 1935 tax sale to the Centre County Commissioners conveyed the entire Eleanor Siddons Warrant including both the surface and subsurface estates. Accordingly, when neither the Kellers nor the surface owners challenged the assessment or tax sale and failed to redeem the property within the relevant redemption period, their title was extinguished, allowing the entire Eleanor Siddons Warrant to be purchased in 1941 by Herr, from whom Herder Spring derives its title. See Reinboth, 29 Pa. at 145 (observing that "[a] tax sale extinguishes all previous titles"); Proctor, 166 F.Supp. at 476-77 (indicating that in the absence of a separate assessment of the minerals, the entire property is subject to the tax sale).

B. Due Process

Assuming *arguendo* that the 1941 Deed to Herr encompassed the Kellers' mineral estate under the relevant law, the Keller Heirs seize upon the Superior Court's *apologia* regarding the "unduly harsh" aspect of this case that is not in line with "modern sensibility." Herder Spring, 93 A.3d at 473. They assert that the Kellers and their heirs were deprived of due process because of the lack of actual notice prior to the tax sale.[16]

---

[16]  In response to Herder Spring and its *amici*'s argument that the Keller Heirs waived their due process claim by failing to raise the issue below, we will assume for the purpose of argument that the Keller Heirs sufficiently preserved this issue through their challenge to the applicability of the 1935 tax sale, given that we ultimately conclude that the Keller Heirs' argument fails on the merits. We do not address whether the (continued…)

The Keller Heirs rely upon well-established precedent regarding due process. As the United States Supreme Court has explained

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citations omitted). In Mullane, the High Court broke with past precedent allowing notice by publication for *in rem* cases, as distinguished from *in personam* cases, and instead opined that due process requirements are not altered by whether an action is deemed *in rem* or *in personam*. Id. at 312-13.

The Court recognized the perils of notice by publication and deemed notice by publication unconstitutional in cases where the parties' identity and place of residence is known to the entity. Id. at 318. The Court, however, allowed notice by publication where the entity was unaware of the relevant parties' interest or addresses, observing that it "has not hesitated to approve of resort to publication as a customary substitute . . . where it is not reasonably possible or practicable to give more adequate warning." Id. at 317.

The High Court specifically addressed the provision of notice of a tax sale to a delinquent property's mortgagee. It opined that "unless the mortgagee is not reasonably identifiable, constructive notice alone does not satisfy the mandate of

_____

(…continued)
Keller Heirs should have raised their due process issue as an affirmative defense, as suggested by the dissent, given that no party has presented that argument to this Court.

Mullane." Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 (1983) (citation omitted). The Court, however, instructed that a government body was not "required to undertake extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record." Id. at n.4; see also First Pennsylvania Bank, N.A. v. Lancaster County Tax Claim Bureau, 470 A.2d 938 (Pa. 1983). Likewise, this Court opined that due process in relation to the collection of taxes "requires at a minimum that an owner of land be actually notified by government, if reasonably possible, before his land is forfeited by the state." Tracy v. Chester County, Tax Claim Bureau, 489 A.2d 1334, 1339 (Pa. 1985).

The Keller Heirs emphasize that the Kellers' reservation of subsurface rights in the 1899 deed was duly recorded in the Centre County recorder of deed's office, which they suggest would have allowed the county officials to provide the Kellers or their heirs actual notice of the 1935 tax sale. They argue that notice by publication did not provide sufficient notice that their reserved interest was subject to tax sale.

At the time of the 1935 tax sale, prior to Mullane and Mennonite, constructive notice through publication was sanctioned for *in rem* actions. As noted above, following the cited decisions of the United States Supreme Court and subsequent decisions of this Court, notice by publication for *in rem* cases was subject to the same due process analysis as for *in personam* actions and was generally disfavored.[17] Nevertheless, the

---

[17] We recognize that a dispute exists whether Mullane and Mennonite should be applied retroactively to tax sales occurring decades ago, especially in cases involving provisions similar to the two-year period in the Act of 1815 for challenging procedural aspects of tax sales. See Quantum Resources Management, L.L.C. v. Pirate Lake Oil Corp., 112 So.3d 209, 215-217 (La. 2013) (recognizing a "divergence of opinion" regarding the retroactive application of Mennonite). As we find the notice by publication was proper in this case even under the due process standards set forth by Mullane and Mennonite, we need not address these contentious questions and instead assume *arguendo* that the cases apply retroactively.

courts approved of "resort to publication as a customary substitute . . . where it is not reasonably possible or practicable to give more adequate warning." Mullane, 339 U.S. at 317. In such situations, the government is not required to make extraordinary efforts. We conclude that what is "reasonably possible or practicable" and what would constitute an "extraordinary effort" requires consideration of the constraints of the era. Accordingly, we look to decisions from the relevant time to guide our determination of whether due process required personal or constructive notice for a 1935 tax sale of unseated land.

Interestingly, this Court has already opined regarding the reasonableness of the notice provided for tax sales of unseated land pursuant to the Act of 1815 in City of Philadelphia v. Miller, 49 Pa. 440, 450-52 (Pa. 1865) and other cases. In City of Philadelphia, we concluded that a party did not receive proper notice of a tax sale where the assessment was made in a name entirely unrelated to the unseated land due to a transcription error, specifically, land warranted to James Trembel was assessed in the name John Turnbull, without any other identifying information. Thus, if the owner of the land had attempted to pay his tax, he would not have found an entry in the assessment list that could be logically linked to his land. Id. at 449-50. Nevertheless, in criticizing the notice in that specific case, this Court explained why notice by publication was proper notice in most cases involving unseated land.

Initially, the Court opined that the law had "ample provision for notice to the owner" through the procedures of creating and compiling the surveys describing the land, allowing the owner a year to pay the taxes assessed, and providing and requiring sixty days' notice of the sale in daily papers both in the relevant county and Philadelphia, in which the property was described by reference to the warrantee or owner. Id. at 450; 72 P.S. § 6001. Indeed, while not mentioned in City of Philadelphia,

tax sales under the Act of 1815 only occurred in even-numbered years on the second Monday in June, which limited the potential for surprise. Peters v. Healey, 10 Watts 208, 210 (Pa. 1840). The Court in City of Philadelphia also approved of notice even if the land was not assessed and taxed in the name of the "real owner" so long as the assessment was made "in the name of one connected by some title with the land," which would allow the owner to identity the property subject to tax. Id. at 451. Compare Humphrey v. Clark, 58 A.2d 836, 839 (Pa. 1948) (considering factors, such as the listing of neighboring properties, allowing for sufficient identification of property when the assessment is made in a name other than the owner) and Wilson, 298 Pa. at 92 (finding assessment of mineral rights in prior owner's name sufficient identification) with Hunter v. McKlveen, 65 A.2d 366, 367-68 (Pa. 1949) (concluding that assessment of property which combined fifty-four tracts into four without other useful information did not provide proper identification of the land subject to tax).

In City of Philadelphia, the Court recognized that ownership of unseated land was often contested, such that it was "not the duty of the tax officers to decide between them." City of Philadelphia, 49 Pa. at 451. Indeed, this Court subsequently opined that "[i]t is common knowledge with those familiar with the subject that it frequently occurs that the owner's deed is not recorded, his name is not registered, he is not known, no one is in actual possession, and there is no apparent owner or reputed owner in the neighborhood of the property." Long, 88 A. at 438. Moreover, referencing the statutory two-year redemption period for tax sales of unseated land, the Court held that even if the owner "received no notice of sale, it required of him no great measure of diligence to look after his interests within two years." City of Philadelphia, 49 Pa. at 451. As this Court has found the notice provision of the Act of 1815 to be reasonable given the difficulties of ascertaining ownership information relating to unseated landowners and

the protection provided by the redemption period, we will not upset that conclusion based on preconceived notions of what is reasonable in the age of the Internet. Accordingly, assuming that Mullane and Mennonite apply retroactively, we conclude that the process of providing notice under the Act of 1815 complies with the dictates of those cases, which recognize that a government entity is not "required to undertake extraordinary efforts" in providing notice. Mennonite, 462 U.S. at 798.

### C. Estoppel by Deed

Lastly, the Keller Heirs assert that Herder Spring should be estopped from asserting a claim to the subsurface rights due to the acknowledgement in their 1959 Deed providing that "[t]his conveyance is subject to all exceptions and reservations as are contained in the chain of title," without specifying the Keller reservation. R.R. at 26a. The Keller Heirs reject the Superior Court's conclusion that the acknowledgement was only subject to "active reservations," as they claim that it is subject to "all exceptions and reservations."

As the Keller Heirs recognize, "[i]t is a well established principle that one claiming under a deed is bound by any recognition it contains of title in another." Elliot, 365 Pa. at 252. However, in that case, the deed specifically mentioned the name of the person who had a claim upon the land, in contrast to the deed in the case at bar which generically stated that the deed was subject to any reservations "contained in the chain of title." Elliot, 365 Pa. at 252-53.

We conclude that at the time of the 1959 Deed to Herder Spring, there was no reservation "contained in the title" because the 1935 tax sale extinguished the prior reservation of the subsurface estate. Notably, a manual from the time of the 1935 tax sale, remarked that because "the land itself is responsible for the taxes regardless of

who is the owner, a purchaser at a tax sale becomes the first link in a new chain of title and he need not prove the title back of the same." William W. Hall, A Manual on Title Searches and Passing Titles in Pennsylvania, § 138 (1934). Accordingly, we find this issue meritless.

### V. Conclusion

We observe that the holding in this case applies to a very limited subset of cases involving quiet title actions for formerly unseated land sold at a tax sale prior to 1947. Indeed, within this subset of cases, the decision would not govern those tax sales which specified whether the assessment involved the surface or the mineral rights. Additionally, the Keller Heirs contend that it would not apply to tax sales where the severance occurred after the tax assessment, as our prior cases address such scenarios. Furthermore, it would not apply where owners can meet the adverse possession standard, which the trial court found Herder Spring missed. Therefore, this case has limited application, though substantial significance to those to which it applies.

In conclusion, we affirm the Superior Court's order vacating the grant of summary judgment in favor of the Keller Heirs and remanding for the grant of summary judgment to Herder Spring Hunting Club.

Chief Justice Saylor and Justices Dougherty and Wecht join the opinion.

Justice Todd files a concurring opinion.

Justice Donohue did not participate in the consideration or decision of this case.