# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | |
| Pennsylvania Game Commission, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. 493 M.D. 2017 |
| | : | ARGUED:  October 2, 2019 |
| Thomas E. Proctor Heirs Trust and | : | |
| the Margaret O.F. Proctor Trust, | : | |
| Defendants | : | |

BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                    FILED:  January 16, 2020

Before this Court are the Motion for Summary Judgment filed by the Pennsylvania Game Commission (Game Commission) and the Motion for Summary Relief filed by the Thomas E. Proctor Heirs Trust and the Margaret O.F. Proctor Trust (together, the Trusts).  The Game Commission initiated this action against the Trusts by filing a Petition for Review in the Nature of a Complaint to Quiet Title and for Declaratory Relief (Petition for Review) in this Court's original jurisdiction.  In its Petition for Review, the Game Commission seeks to quiet title to the surface rights (Surface Estate) and the rights to the oil, gas, and minerals in, on, and under a 2,000-acre tract of land (Subsurface Estate) located within State Game Lands

Number 133 in Lewis and Gamble Townships in Lycoming County, Pennsylvania (the Premises).[1]  For the reasons that follow, we deny both the Game Commission's Motion for Summary Judgment and the Trusts' Motion for Summary Relief.

## Background

Thomas E. Proctor, an entrepreneur in the leather business, was the owner in fee simple of more than 130 tracts of land, comprising 59,000 acres, which included the Premises.[2]  This acreage spans several Pennsylvania townships and counties, but the Premises is located in Lycoming County.

In October 1894, Thomas E. Proctor and his wife, Emma H. Proctor, conveyed the Surface Estate of the Premises to Elk Tanning Company (Elk Tanning),

---

[1] Pennsylvania recognizes three estates in land: (1) the surface estate; (2) the mineral (or subsurface) estate; and (3) the support estate.  *Smith v. Glen Alden Coal Co.*, 32 A.2d 227, 234-35 (Pa. 1943).  "Because these estates are severable, different owners may hold title to separate and distinct estates in the same land."  *Hetrick v. Apollo Gas Co.*, 608 A.2d 1074, 1077 (Pa. Super. 1992).

[2] The Premises is comprised of the following eight tracts of land or "warrants":  Mary Rustin; Charlotte Rustin; John Reed; Robert Straub; William Barker; John Barron, Jr.; Samuel Straub; and Mary Rustin, Jr.  *See* Game Comm'n's Mot. for Summ. J. at 3-4.  "Warrant" is a historical term used in early Pennsylvania property law.  As explained by our Supreme Court:

> Generally, a person seeking to purchase land would submit an application to the Land Office.  The secretary would issue a warrant, which described the land, the property adjoining the land, the purchaser, the purchase price, and the terms of sale.  The issuance of the warrant triggered the surveyor general's responsibility for surveying the land, which would produce a survey map that identified important features on the land and adjoining properties and town and county boundaries, which helped to create cohesive maps of the area.

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 360 n.3 (Pa. 2016).

excepting and reserving unto themselves, their heirs, and assigns the Subsurface

Estate (Proctor Reservation).[3] The Proctor Reservation stated in pertinent part:

> *Thomas E. Proctor, however, hereby expressly reserves from this grant, to himself, his heirs and assigns, all the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character in, upon or under the [Premises]*, and hereby conveyed, and every part thereof, or which may at any time hereafter be discovered in, upon or under said lands, or any part thereof, with the right to enter upon said lands for purposes of exploration, and for the taking away the said

---

[3] In a related federal proceeding involving the same parties, which the parties cite in this appeal, the United States District Court for the Middle District of Pennsylvania elaborated on Thomas E. Proctor's business ventures as follows:

> Mr. Proctor, who was born in South Danvers (now Peabody), Massachusetts on August 29, 1834, was introduced at an early age to the tanning industry by his father Abel Proctor, who was a tanner and leather merchant. By 1853, Abel made his son a partner at Abel Proctor & Son and, in the ensuing years, Mr. Proctor gained undisputed control of the tanning industry. In particular, he obtained a number of properties in Pennsylvania, where hemlock timber, a key ingredient that was used in tanning leather, was abundant. . . .

> . . .

> Thomas E. Proctor, along with several other entrepreneurs, formed the United States Leather Company in the late 1800s. They acquired large tracts of hemlock forest in north-central Pennsylvania, and elsewhere, in order to secure hemlock bark, a necessary tanning leather ingredient. Mr. Proctor and the other entrepreneurs and their heirs—the so-called, tanning families—conveyed the surface of the acquired land to subsidiaries of the United States Leather Company, including Elk Tanning . . . and Union Tanning Company, but reserved the oil, gas, and minerals to themselves and their heirs. . . .

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 2017 WL 4275427, at *1, *3 (M.D. Pa. filed Aug. 11, 2017) (footnotes and internal citations omitted); *see Herder Spring*, 143 A.3d at 367-68 & n.10 (referencing Thomas E. Proctor's tanning business and interest in the United States Leather Company).

natural gas, coal, coal oil, petroleum, marble or other minerals hereby reserved . . . .

Trusts' App. of Evid., Vol. 1, at 67a (emphasis added).[4]  Thomas E. Proctor died two months after conveying the Premises to Elk Tanning, in December 1894.

In May 1903, Elk Tanning conveyed the Premises to its affiliate, Central Pennsylvania Lumber Company (CPLC), subject to the Proctor Reservation.

In June 1908, several warrants within the Premises were sold at a tax sale due to the non-payment of assessed taxes (1908 Tax Sale).  Calvin H. McCauley, Jr., CPLC's then-Treasurer, purchased the Premises at the 1908 Tax Sale.  At the time of the 1908 Tax Sale, the Premises was unseated.[5]  In December 1910, Mr. McCauley conveyed the Premises back to CPLC via quitclaim deed for $1.

In June 1924, all eight warrants within the Premises were sold at a tax sale (1924 Tax Sale) and purchased by CPLC's then-General Solicitor, A.F. Jones, who then quitclaimed the Premises back to CPLC for $1.  In October 1924, CPLC conveyed the Premises to William Caprio and Anthony Grieco, subject to the Proctor Reservation.  In 1937, Mr. Caprio & Mr. Grieco conveyed their interests in the Premises to the Game Commission.

---

[4] The 42-page deed from Thomas E. Proctor to Elk Tanning is entirely handwritten.  *See* Trusts' App. of Evid. Vol. 1, at 27a-69a.  The handwritten deed is very difficult to read, but the text of the Proctor Reservation also appears in Volume 2 of the Trusts' Appendix of Evidence at pages 197a-98a.

[5] "Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land." *Herder Spring*, 143 A.3d at 363.  "Seated land was property that had been developed with residential structures, had personal property upon it that could be 'levied upon for the tax due[,'] or was producing regular profit through cultivation, lumbering, or mining." *Id.*  In contrast, unseated land was "wild" or undeveloped land, which "included any land that did not meet the requirements of being seated." *Id.*  It is undisputed that the Premises was unseated at the time of the 1908 and 1924 Tax Sales.

4

On October 25, 2017, the Game Commission filed its Petition for Review, averring that it owns in fee simple both the Surface and Subsurface Estates of the Premises. On January 12, 2018, the Trusts filed an Answer and New Matter, in which they deny that the Game Commission owns the Subsurface Estate. The Trusts aver that, in 1894, Thomas E. Proctor specifically excepted and reserved unto himself and his heirs "all the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character . . . in, upon, or under the [Premises]," Trusts' App. of Evid., Vol. 1, at 67a, and that the Trusts have not been divested of such title. Thus, the Trusts allege that, as Thomas E. Proctor's heirs, they continue to hold 100% legal title to the Subsurface Estate.

On February 15, 2019, the Game Commission filed its Motion for Summary Judgment[6] and the Trusts filed their Motion for Summary Relief.[7] The parties have now fully briefed and presented oral argument on their respective Motions.

---

[6] The Game Commission titled its motion a "Motion for Summary Judgment." However, because the Game Commission filed a Petition for Review in this Court's original jurisdiction under Pa. R.A.P. 1501(a)(3), the Game Commission's motion is properly characterized as a Motion for Summary Relief under Pa. R.A.P. 1532(b), rather than a Motion for Summary Judgment under the Rules of Civil Procedure. As such, we will treat the Game Commission's Motion as a Motion for Summary Relief filed under Pa. R.A.P. 1532(b). *See Pa. Manufs.' Ass'n Ins. Co. v. Johnson Matthey, Inc.*, 160 A.3d 285, 287 n.1 (Pa. Cmwlth. 2017); *Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 193 n.1 (Pa. Cmwlth. 2015). As discussed in note 7, *infra*, we apply the same standard of review for a motion for summary relief as we do for a motion for summary judgment.

[7] Pennsylvania Rule of Appellate Procedure 1532(b) provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b). "An application for summary relief is properly evaluated according to the standards for summary judgment." *Myers v. Com.*, 128 A.3d 846, 849 (Pa. Cmwlth. 2015). In ruling on a motion for summary relief, we must view the evidence in the light most favorable to the non-moving party and may enter judgment only if: (1) there are no genuine issues of material fact; and (2) the right

**Analysis**

Despite the vast factual history and the voluminous nature of the record, this case boils down to one central issue: Who owns the Subsurface Estate beneath the Premises: the Game Commission or the Trusts?[8] The parties assert that in order to answer this question, this Court must first determine whether the 1908 and 1924 Tax Sales conveyed the entire Premises (as advocated by the Game Commission), or merely the Surface Estate of the Premises (as advocated by the Trusts). However, we are unable to do so at this stage of the proceedings.

As discussed in note 7, *supra*, this Court may grant summary relief if: (1) there are no genuine issues of material fact; and (2) the moving party's right to relief is clear as a matter of law. *See Nw. Youth Servs.*, 1 A.3d at 990 n.1; Pa. R.A.P. 1532(b). Based on our review of the record, the parties' briefs and oral arguments, and the relevant law, we conclude that material issues of fact still exist and that neither party has established a clear right to relief as a matter of law. As discussed more fully below, there remain factual questions regarding the numerous transfers of ownership of the Premises between 1908 and 1937, particularly with respect to the 1908 and 1924 Tax Sales.

### 1. *Herder Spring* and The Act of 1806

Both parties rely on the Pennsylvania Supreme Court's decision in *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016), to support their respective

---

to relief is clear as a matter of law. *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 1 A.3d 988, 990 n.1 (Pa. Cmwlth. 2010).

[8] The plaintiff in a quiet title action "has the burden of proof and must recover on the strength of [his or her] own title." *Herder Spring*, 143 A.3d at 372; *see Albert v. Lehigh Valley Coal & Navigation Co.*, 246 A.2d 840, 843 (Pa. 1968) ("[I]n an action to quiet title, the plaintiffs must recover on the strength of their own title and not upon the weakness of the title of the defendant.").

positions. *Herder Spring* involved a dispute over the ownership of subsurface rights to a tract of land in Centre County. *Id.* at 359. The issue on appeal was whether a 1935 tax sale resulted in the transfer of the entire property, or merely the surface rights to the property. *Id.*

In 1894, the Kellers bought property at a tax sale in Centre County. *Id.* at 360. In 1899, they sold the *surface rights* of that property to the Becks, but expressly reserved the *subsurface rights* to themselves "through an extensive reservation that indisputably covered the natural gas at issue." *Id.* However, there was no evidence in the record that the Becks had complied with the Act of March 28, 1806, P.L. 644 (Act of 1806) (repealed), which required any person who became "a holder of unseated land" to provide notice to the county commissioners of the transfer of ownership. *Id.*[9] There was also no evidence that the Kellers had informed the county commissioners of their reservation of subsurface rights. *Id.*

The Supreme Court explained that if a purchaser of unseated land failed to report a severance to the county commissioners, a subsequent tax sale would effectively "wash" the title of the severance and vest the tax sale purchaser with all right, title, and interest in both the surface and the subsurface rights, as if the severance had never occurred. *Id.* at 366-67. The Court noted, however, that the Act of 1806 did not impose a duty on the county commissioners to obtain

---

[9] The Act of 1806 provided:

> [I]t shall be the duty of every person hereafter becoming a holder of unseated land, by gift, grant, or other conveyance to furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor, with in one year, from and after such conveyance.

*Herder Spring*, 143 A.3d at 368 (quoting the Act of 1806).

7

information regarding the unseated land or to search through deed books to discover whether a tract of land had changed hands. *Id.* at 368-69.

Ralph Smith eventually acquired the surface rights to the disputed property. *Id.* at 360. Subsequently, in 1935, due to unpaid taxes, the county commissioners acquired the property at a treasurer's sale. *Id.* Following that sale, the county commissioners held the property until 1941, when they sold the property to Max Herr, whose widow later sold the property to the Herder Spring Hunting Club (Hunting Club). *Id.* at 361. The deed to the Hunting Club "provid[ed] that '[t]his conveyance is subject to all exceptions and reservations as are contained in the chain of title,' without specifying the Keller reservation." *Id.* at 378 (quoting record).

After acquiring the property, the Hunting Club entered into several oil and gas leases, and eventually filed a complaint to quiet title in 2008 against the Keller heirs, "presumably as a result of the discovery of Marcellus Shale on the property." *Id.* at 361. The Hunting Club argued that the 1935 tax sale extinguished the Kellers' 1899 reservation of subsurface rights. *Id.* In support of its position, the Hunting Club argued that because the county commissioners had not been notified of the Kellers' reservation of rights, taxes were assessed against the *entire property*, and the subsequent tax sale of that property resulted in the transfer of *both* the surface and subsurface estates. *Id.* The Keller heirs, on the other hand, argued that the 1935 tax sale only resulted in the transfer of the *surface rights* to the property, "despite acknowledging that 'Centre County did not separately assess the [p]roperty's oil and gas interests prior to the Tax Sale of 1935.'" *Id.* at 362 (quoting record).

After an extensive review of the historical law regarding tax sales of unseated lands in Pennsylvania, the Supreme Court concluded that the 1935 tax sale conveyed the *entire property*, i.e., both the surface and subsurface estates. *Id.* at 359. The

8

Supreme Court explained that although the property had been severed into surface and subsurface estates, neither party to that transaction reported such severance to the county commissioners. *Id.* at 372. Therefore, *absent proof to the contrary*, the Supreme Court could presume that because the severance was never reported, the entire property continued to be assessed, taxed, and sold as a whole. *Id.*

The Supreme Court also observed that the documents relating to the 1935 tax sale did not indicate that the assessment occurred on anything other than the entire property. *Id.* at 375. As a result, the Supreme Court concluded that the 1935 tax sale conveyed the entire property. *Id.* Thus, when neither the Keller heirs nor the surface owners challenged the assessment or tax sale and failed to redeem the property within the requisite redemption period,[10] the Keller heirs' title was extinguished, thereby allowing the entire property to be purchased by Mr. Herr, from whom the Hunting Club derived its title. *Id.* Therefore, the Supreme Court vacated the entry of summary judgment in favor of the Keller heirs and remanded for the entry of judgment for the Hunting Club. *Id.* at 379.

---

[10] "[The Act of March 13, 1815, P.L. 177 (Act of 1815) (repealed)] provided specific instructions regarding the process of selling unseated land to collect unpaid taxes." *Herder Spring*, 143 A.3d at 365. "To protect the delinquent owner while also providing finality for the purchaser, the legislature provided a two[-]year redemption period." *Id.* at 366. The Act of 1815 stated that after the two-year period,

> [i]n no other case and on no other plea, shall an action be sustained . . . [and] no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.

*Id.* (quoting Act of 1815). A five-year redemption period applied if the property was purchased by the county commissioners at a tax sale. *Id.*

9

However, the Supreme Court clarified that its decision "applies to a very limited subset of cases involving quiet title actions for formerly unseated land sold at a tax sale prior to 1947." *Id.* at 378. The Court further instructed that, within that subset of cases, its "decision would not govern those tax sales which specified whether the assessment involved the surface or the mineral rights." *Id*. at 378-79.

With this precedent in mind, we now turn to the material issues of fact that we believe preclude the entry of summary relief for either party.[11]

## 2. Material Issues of Fact

### a. Reporting of the Severance

We conclude that material issues of fact exist regarding whether the severance of the Surface and Subsurface Estates was reported to the Lycoming County Commissioners (County Commissioners), as required by the Act of 1806, and whether the unpaid taxes that triggered the 1908 and 1924 Tax Sales were assessed on the Premises as a whole or merely on the Surface Estate.

The Trusts point out that, after 1924, the deeds for the Premises in the Game Commission's chain of title do not specifically reference the 1908 and 1924 Tax Sales, but continue to reference the Proctor Reservation. They claim that these references to the Proctor Reservation show that the severance of rights was reported to the County Commissioners. *See Herder Spring*, 143 A.3d at 378 (stating that where the post-tax sale deed "specifically mention[s] the name of the person who had a claim upon the land," the grantee is estopped from claiming title to that reserved interest); *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896) ("[T]he owner of mineral rights holding by virtue of a reservation in a deed is neither a tenant in

---

[11] The parties raise a myriad of issues in their respective Motions, many of which overlap. In this analysis, we have highlighted only a few of the key factual issues that preclude us from granting either Motion.

10

common nor a joint tenant with the owner of the surface. Each has a separate estate."). Moreover, after the 1924 Tax Sale, CPLC sold the Premises to Mr. Caprio and Mr. Grieco expressly subject to the Proctor Reservation, which would have been unnecessary if CPLC had already obtained title to the Subsurface Estate via the Tax Sales.

The Trusts have submitted various township assessment records reflecting that the 1894 Proctor Reservation was reported to Lycoming County taxing authorities. *See* Trusts' App. of Evid., Vol. 5, at 312a-48a, 381a-91a. For example, the 1905 assessment book for McIntyre Township states:

> The following tracts of land are assessed to the [Thomas E. Proctor's heirs] as owners of . . . all coal, ores, oils, salt, water minerals, quarrying stone, marble on, in, and under the tracts of unseated lands situate on, in, and under the tracts of unseated lands situated in McIntyre Township [and] for [a] description of [the] reserve of all minerals[,] [r]efer to Recorders Office of Lycoming County in Deed Book 144 page 398 [(the 1894 deed from Thomas E. Proctor to Elk Tanning)].

*Id.* at 318a. All of these assessment records, however, relate to properties in other townships in Lycoming County and do not encompass the Premises. According to the Trusts, only McIntyre Township and McNett Township had known production of subsurface minerals at that time, so only those townships had a basis to separately assess the subsurface estates. The Trusts claim that because there was no development of oil, gas, or minerals beneath the Premises, taxes were never separately assessed against the Subsurface Estate.

The Trusts also rely extensively on evidence that was admitted during the 1905 trial in *Gamble v. Central Pennsylvania Lumber Company*.[12] In that case,

_____

[12] The testimony and evidence from the 1905 *Gamble* trial were reproduced in a volume of the "Supreme Court Paper Books," which is included in Volume 2 of the Trusts' Appendix of Evidence.

11

Thomas E. Proctor's attorney at that time, B.S. Bentley, Esquire, testified that he looked after Mr. Proctor's unseated lands and personally dealt with the county treasurers to ensure that the lands were properly enrolled. Trusts' App. of Evid., Vol. 2, at 207a-12a. According to the Trusts, this evidence supports the reasonable inference that Thomas E. Proctor followed this practice with respect to all of his unseated properties, including the Premises. Further, the 1894 deed conveying the Premises from Thomas E. Proctor to Elk Tanning, which contained the Proctor Reservation, was provided to the Lycoming County Treasurer and introduced as evidence in the *Gamble* trial. *See id.* at 196a-98a.

The Trusts have also submitted as evidence a stipulation in another matter, *Moore v. Commonwealth*, which they claim demonstrates that the 1908 and 1924 Tax Sales conveyed only the Surface Estate of the Premises. In *Moore*, the Commonwealth of Pennsylvania (Commonwealth) stipulated as follows:

> For each of the relevant years, *1908 through 1926, during which the tax sales of the surface estates took place,* the Lycoming County Tax Assessor's records for McIntyre Township (Exhibits H through Z inclusive) contained *a written statement by the Tax Assessor acknowledging the reservation of all minerals in Proctor Deed 144/398* in the following general form:
>
> > For a description of reserve of all minerals refer to Recorders [O]ffice of Lycoming County in Deed Book 144 page 398.

Trusts' App. of Evid., Vol. 6, at 360a-61a (emphasis added).[13] This stipulation, however, pertains to Thomas E. Proctor's lands in a different township in Lycoming County.

---

[13] This stipulation was executed by Martha R. Smith, then-counsel for the Commonwealth's Department of Conservation and Natural Resources. *See* Game Comm'n's Exs. in Opp. to Mot for Summ. Relief, Ex. 1, ¶¶ 2, 4.

The Trusts also rely on another case involving Thomas E. Proctor's lands, wherein the Pennsylvania Superior Court determined that notice of the Subsurface Estate, as memorialized in the 1894 deed, was given in conformance with the Act of 1806, resulting in a separate assessment of the Surface and Subsurface Estates. *See Cornwall Mountain Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148, 161 (Pa. Super.) ("Either the Proctor heirs or the surface owners were obligated under the [Act of 1806] to notify the taxing authority of their severed property interests so that they could be separately assessed. *In fact, notice was given and a separate assessment of the mineral rights and the surface estate was conducted*.") (emphasis added), *appeal denied*, 172 A.3d 594 (Pa. 2017). However, *Cornwall* also involved Thomas E. Proctor's lands in other townships, and the assessments relating to those lands occurred in 1930 and 1931, well after the Tax Sales in this case. *See id.* at 151.

In response to the Trusts' claims, the Game Commission contends that it is irrelevant whether Thomas E. Proctor, Elk Tanning, or CPLC "declared" or "reported" their "interests" in the Premises to the County Commissioners by the recording of deeds with Lycoming County. Under *Herder Spring*, the issue is whether they separately reported *the severance of rights* to the County Commissioners. The Game Commission contends that they did not, and that the consequence of their failure to report the severance caused the Premises to be taxed as a whole and, subsequently, sold as whole at the 1908 and 1924 Tax Sales. *See Herder Spring*, 143 A.3d at 372.

Aside from the references in the recorded deeds to the Proctor Reservation, the record contains no evidence that the Trusts' predecessors-in-title ever notified the County Commissioners that, in 1894, the Premises had been divided into Surface and Subsurface Estates, such that they should be assessed and taxed separately.

13

According to the Game Commission, the fact that separate assessments of mineral rights existed for other tracts of land in other townships in Lycoming County merely shows that the Trusts' predecessors-in-title intentionally chose not to report the severance of the Premises, presumably to avoid paying separate taxes thereon. *See* Game Comm'n's Exs. in Support of Mot. for Summ. J., Ex. A., ¶ 12 ("Based upon my review of the public records of Lycoming County, there is no evidence establishing that the assessor or [C]ounty [C]ommissioners ever assessed the subsurface rights in and under the Premises separately from the [S]urface [E]state prior to the 1908 and 1924 [T]ax [S]ales.").

Consequently, the Game Commission contends that, under *Herder Spring*, when Mr. Caprio and Mr. Grieco conveyed the Premises to the Game Commission in 1937, the Proctor Reservation was not included in the title transfer, because the 1908 and 1924 Tax Sales had extinguished it, rendering it a nullity. The fact that the 1937 deed refers to the Proctor Reservation is not binding on the Game Commission, because no such reservation of rights legally existed at the time of the conveyance. *See Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 475 (W.D. Pa. 1958) ("[W]here there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals."), *aff'd*, 265 F.2d 196 (3d Cir. 1959).

Therefore, based on the evidence of record, while a reasonable trier of fact could conclude that the Trusts' predecessors-in-title reported the severance of the Surface and Subsurface Rights, a reasonable trier of fact could also conclude they did not.[14]

---

[14] In their brief in opposition to the Game Commission's Motion for Summary Judgment, the Trusts aver that "the evidence establishes at a minimum that there are genuine questions of fact

14

**b. The 1908 and 1924 Tax Sales**

Next, we conclude that a material issue of fact exists with regard to whether Mr. McCauley and Mr. Jones acted as agents of CPLC when they purchased the premises at the 1908 and 1924 Tax Sales. If they did, then the Trusts claim that the tax sale "purchases" were the functional equivalent of redemptions, thereby restoring the Trusts' ownership of the Subsurface Estate. *See Knupp v. Syms*, 50 A. 210, 212 (Pa. 1901) (finding that a tax sale purchase "must be deemed equivalent to a redemption" where the purchaser "was at the time and for years before and afterwards, agent for the owners . . . concerning the taxes and assessment" of the land); *Patterson v. Brindle*, 9 Watts 98, 101 (Pa. 1839) (holding that the agent of the deceased principal, by purchasing the title from the tax sale purchaser, had redeemed the unseated land "for the benefit of all having title"). If Mr. McCauley and Mr. Jones did not act as CPLC's agents, then the Game Commission contends that the transactions were valid purchases of the entire Premises under *Herder Spring*.

The Trusts assert that the Game Commission has acknowledged, on several occasions in the past, that Mr. McCauley and Mr. Jones were acting as CPLC's agents at the time of the 1908 and 1924 Tax Sales. For example, in an August 1931 letter to CPLC, John E. Potter, Examiner of Land Titles for the Game Commission, stated:

> *It is probable, however, that the bids by Mr. Jones were paid with funds of [CPLC]* and it is also probable that it was passably understood, without any need for discussion, that Mr. Jones would re-convey to [CPLC] his tax titles when they matured by the expiration of the redemption period[,] which deed of re-conveyance he has in fact executed and delivered. *I am included [sic] to question whether under*

_____

as to whether the [Thomas E.] Proctor [subsurface] interest was reported to Lycoming County officials." Trusts' Br. in Opp. to Mot. for Summ. J. at 4.

15

*the circumstances . . . the tax sales have any greater effect than that of redemption, in which case the title to the oil, gas and minerals would not be divested . . . .*

Trusts' App. of Evid., Vol. 10, at 629a. Mr. Potter also stated in a June 1931 letter to the Game Commission's Executive Secretary:

*The practice of [CPLC] has been to let its lands go to tax sale and have the lands bid [on] at tax sale by persons, whom from long[-]continued dealings with [CPLC] making settlement for lands purchased by the Department of Forests and Waters and the Game Commission, I know to be the attorneys and [c]ounsellors-at-[l]aw for [CPLC], and who, I surmise, pay their bids with the funds of [CPLC]* and later re-convey the lands to [CPLC]. I have been unwilling heretofore to recommend the acceptance of the title based wholly upon a tax sale where the taxes delinquent are those of [CPLC] and the purchaser has been [an] attorney of [CPLC].

*Id.* at 637a-638a.

Moreover, the Game Commission's abstractor, E. Bruce Taylor, who surveyed the Premises prior to the 1937 conveyance, noted that Mr. McCauley and Mr. Jones were "apparently" acting for CPLC at the time of the 1908 and 1924 Tax Sales. *See* Pet. for Review, Ex. A, at 150. Mr. Taylor stated:

We have now traced []to [Thomas E.] Proctor all the record title to the various tracts, and in Item 126, he consolidates the same and conveys to [Elk Tanning] <u>reserving the minerals</u>. His grantee, at Item 127, conveys to [CPLC], reserving all bark for 25 years. Items 128 to 132, are tax sales of the John Reed, Samuel Straub and the three Ruston [warrants] to *Calvin H. McCauley, Jr. who apparently was acting for [CPLC]*, as at Item 133, he quitclaims to it. . . .

The deed to [Mr.] Caprio and [Mr.] Grieco is dated October 25, 1924. On June 9, 1924, *all eight [warrants] were sold at tax sale to A. F. Jones, apparently acting for [CPLC]*, as at Item 137, he quitclaims to it.

16

*Id.* (emphasis added).

As the Game Commission points out, however, much of the evidence on which the Trusts rely to establish the agency relationships of Mr. McCauley and Mr. Jones post-dates the transactions at issue, and the Trusts' arguments are based purely on speculation by the persons who made the statements. According to the Game Commission, the only relevant evidence is that which is included in the *public records of Lycoming County* from the relevant time period. *See Proctor*, 166 F. Supp. at 480 ("The public records of Elk County cannot be impeached by any facts offered in evidence."). None of the Trusts' proffered documents is in the public records of Lycoming County, such that an examiner of such records could acquire any knowledge as to the relationship between Mr. McCauley or Mr. Jones and CPLC.

Moreover, contrary to the evidence cited by the Trusts, the deeds from the relevant time period do not indicate that Mr. McCauley and Mr. Jones were acting on behalf of CPLC when they purchased the Premises. The 1910 quitclaim deed to CPLC identifies the grantors as "Calvin H. McCauley, Jr. and Florence M., his wife." Trusts' App. of Evid., Vol. 9., at 533a. Similarly, the 1924 quitclaim deed to CPLC identifies the grantors as "A.F. Jones and Katherine A. Jones, his wife." *Id.*, Vol. 10, at 588a.[15] Therefore, while a reasonable trier of fact could conclude that

---

[15] The record does not appear to contain the deeds from either of the Tax Sales at issue here. The record does contain a deed from a 1910 tax sale of unseated land in Pine Township, Lycoming County, which Mr. McCauley also purchased. Notably, the 1910 deed is from the Lycoming County Treasurer to "Calvin H. McCauley, Jr." and makes no mention of CPLC. Trusts' App. of Evid., Vol. 10, at 536-38a; *see also id.*, Vol. 7, at 439-40a (identifying "Calvin H. McCauley, Jr." as the purchaser of unseated lands in several Lycoming County tax sales in June 1908).

17

Mr. McCauley and Mr. Jones were acting as CPLC's agents, there is also evidence from which a reasonable trier of fact could conclude they were not.[16]

The Game Commission argues that in cases where a redemption for unpaid taxes has been found, the evidence before the court established a redemption as a matter of fact. *See, e.g., Coxe v. Sartwell*, 21 Pa. 480, 486-87 (Pa. 1853) ("The money was paid and received [by the tax sale purchaser] *under a claim of [a] right to redeem*.") (emphasis added); *Phila. v. Miller*, 192 Pa. Super. 239, 242 (Pa. Super. 1956) (stating that "the lower court decided this matter in reliance upon . . . *sworn admissions of a redemption*") (emphasis added). Here, aside from general references to the agency relationships of Mr. McCauley and Mr. Jones, there is no evidence showing that Mr. McCauley or Mr. Jones intended to, or did, redeem the Premises for CPLC via the 1908 and 1924 Tax Sale purchases. Nor is there any evidence that the Trusts' predecessors-in-title attempted to redeem the Premises, or otherwise challenge the tax sales, within the two-year redemption period. *See Herder Spring*, 143 A.3d at 366 (stating that once the redemption period has passed, "no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal") (quoting the Act of 1815).

We are unable to determine on the present record whether Mr. McCauley and Mr. Jones acted as agents of CPLC when they purchased the Premises or whether they intended to, or did, redeem the Premises for CPLC at the time of the 1908 and 1924 Tax Sales.

---

[16] *See Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 2019 U.S. Dist. LEXIS 28522, at *70 (M.D. Pa. filed Feb. 21, 2019) (finding that genuine issues of fact existed regarding whether Mr. McCauley acted as CPLC's agent for purposes of a tax sale of a Bradford County parcel, where there was conflicting record evidence).

## Conclusion

In sum, we conclude that several, interrelated factual issues remain in this matter, including: whether the severance of the Surface and Subsurface Estates was reported to the County Commissioners; whether Mr. McCauley and Mr. Jones acted as agents of CPLC at the time they purchased the Premises; and whether the 1908 and 1924 Tax Sales operated as valid purchases or only as redemptions for unpaid taxes. The record does not provide clear answers to these questions.

Although both parties believe the Supreme Court's decision in *Herder Spring* entitles them to relief, there are still many uncertainties in this case that were not present in *Herder Spring*, as outlined above. Accordingly, at this stage of the proceedings, we are compelled to deny both the Game Commission's Motion for Summary Judgment and the Trusts' Motion for Summary Relief.

_____

ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania,   :
Pennsylvania Game Commission,   :
         Plaintiff   :
        :
     v.      :  No. 493 M.D. 2017
        :
Thomas E. Proctor Heirs Trust and   :
the Margaret O.F. Proctor Trust,   :
        Defendants   :

# **O R D E R**

AND NOW, this 16th day of January, 2020, we hereby DENY the Motion for Summary Judgment filed by the Pennsylvania Game Commission and DENY the Motion for Summary Relief filed by the Thomas E. Proctor Heirs Trust and the Margaret O.F. Proctor Trust.

_____
ELLEN CEISLER, Judge